Filed 10/28/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| INDUSTRIAL WASTE AND DEBRIS BOX SERVICE, INC. et al., <br><br>    Plaintiffs and Respondents, <br><br> v. <br><br>  BRUCE MURPHY et al., <br><br>    Defendants and Appellants. | A142388 <br><br> (Sonoma County <br> Super. Ct. No. SCV251784) |

This suit involves garbage and, more specifically, statements about garbage. Garbage, including its transport, handling and disposal, is heavily regulated. The Legislature enacted the California Integrated Waste Management Act of 1989 (the Act) to address the fact that "landfills throughout the state were nearly filled, and we were figuratively awash in our own trash." (*Valley Vista Services, Inc. v. City of Monterey Park* (2004) 118 Cal.App.4th 881, 886 (*Valley Vista*); see Pub. Res. Code, §§ 40000, 40050.) "Its goals were to reduce, recycle and reuse solid waste to the extent possible. Local agencies such as cities which were responsible for waste disposal within their boundaries were obliged to enact comprehensive waste management plans that would eventually divert half of their trash from landfills." (*Valley Vista*, at p. 886.) "A major component of the Act . . . is the substantial mandatory solid waste disposal diversion requirements imposed by [Public Resources Code] section 41780. That section provides in part that cities and counties, through solid waste reduction, recycling, and composting activities, 'shall divert 25 percent of all solid waste from landfill . . . by January 1, 1995' and '50 percent of all solid waste by January 1, 2000.' ([Pub. Res. Code,] § 41780,

1

subd. (a)(1), (2).)" (*Waste Management of the Desert, Inc. v. Palm Springs Recycling Center, Inc.* (1994) 7 Cal.4th 478, 493 [George, J., dissenting]; see also Pub. Res. Code, §§ 40052, 40900.1, 41000, 41002.)[1]  The Act authorized local governments to issue franchises and licenses to private entities to provide various services relating to the collection, transport, handling and disposal of solid waste.  (Pub. Res. Code, § 40059.)

At the center of this dispute are statements about garbage; more specifically, statements about the activities of a company in the business of hauling solid waste. Plaintiff[2] hauls waste under franchise agreements it has with several cities in Sonoma County.  Defendants[3] are a waste management consultant and his company, who prepared a report for one of plaintiff's competitors.  Defendants' report questioned the accuracy of statements in plaintiff's public reports about the percentages of the waste materials it collected that were recycled and thereby diverted from landfills.  Plaintiff's complaint alleged defendants' report was false and defamatory and injured plaintiff's business.

Shortly after plaintiff served its complaint on defendants, defendants filed an "anti-SLAPP" motion to dismiss the complaint.  The trial court held defendants met their burden of showing plaintiff's claims involve speech concerning a matter of public interest and are therefore covered by the anti-SLAPP statute, Code of Civil Procedure sections 425.16 to 425.18.[4]  However, it denied defendants' motion because, in its view, plaintiff demonstrated a probability of success on the merits sufficient to survive

---

[1]  More recently, the Legislature declared it "the policy goal of the state that not less than 75 percent of solid waste generated be source reduced, recycled, or composted by the year 2020, and annually thereafter."  (Pub. Res. Code, § 41780.01, subd. (a).)

[2]  There were multiple plaintiffs below, but only one opposed defendants' motion. We refer to that plaintiff, who is the respondent on appeal, as "plaintiff" or "Industrial Carting."

[3]  There was a third defendant below, but he did not participate in defendants' special motion to strike and therefore is not a party to this appeal.  When we refer to "defendants" we mean appellants, Bruce Murphy and IntelliWaste, Inc., who were the moving parties below.

[4]  Statutory references are to the Code of Civil Procedure unless otherwise specified.

dismissal. Exercising independent review, we conclude the trial court was correct in holding that plaintiff's claims are subject to the anti-SLAPP law but erred in concluding that plaintiff met its burden to show it has viable claims. For that reason, we reverse with directions to the trial court to grant defendants' motion.

## BACKGROUND

Plaintiff Industrial Waste and Debris Box Rentals, Inc., doing business as Industrial Carting, is engaged in the business of collecting and hauling waste, primarily in construction and demolition debris boxes, the waste from which is commonly referred to as "C&D." Plaintiff provides debris box, recycling and hauling services in cities and unincorporated areas within the counties of Sonoma and Marin. As relevant here, it provides these services under licenses or franchises with the cities of Petaluma, Rohnert Park, Santa Rosa and the town of Windsor. Plaintiff's sister company,[5] Global Materials Recovery Services, Inc. (Global Materials), operates a recycling operation and a materials recovery facility (MRF), which are licensed and regulated by the State of California.

Defendant Bruce Murphy is the owner, president and sole employee of his co-defendant, IntelliWaste, Inc., which provides operational and financial review and analysis of solid waste management systems, including collection, recycling and disposal. Intelliwaste was commissioned by North Bay Corporation (North Bay), to review and analyze the C&D diversion rates by local licensed services providers in Petaluma, Rohnert Park, Santa Rosa and Windsor. North Bay, like Industrial Carting, is licensed or franchised to provide C&D hauling services in those jurisdictions.

IntelliWaste issued a report to North Bay, entitled "Analysis of C&D Diversion for 2009 and 2010 in select Sonoma County Jurisdictions" (the Report). The analysis in the Report was based on various public documents, including public reports made by licensees and franchisees to local jurisdictions, landfill records, and public reports made by Global Materials to a state agency, copies of which were appended to the report. The

---

[5] Industrial Carting and Global Materials share a business manager and other employees, have common officers and principals, and operate on the same property. However, they are separate entities.

3

Report concluded that for the two years studied, diversion rates for North Bay (71.98 percent and 78.29 percent) and a company called M&M Services (71.30 percent and 81.70 percent) were "in agreement with expected results from processing C&D materials at C&D MRFs in the Bay Area." The Report stated: "[f]or 2009 and 2010, Industrial Carting reported C&D diversion of 87% for Windsor and 100% diversion with no disposal for the cities of Santa Rosa, Rohnert Park, and Petaluma. These numbers exceed industry standard benchmarks and we consider the data not credible without further detailed information from the company." The Report further stated that "[f]or 2009 and 2010, based on information available from public records, we calculated the total facility diversion rate for the Industrial Carting MRF, regardless of which jurisdiction the material came from, as being 33.5% and 34.75%, respectively" and that "[b]ased on public documents we concluded that the diversion rate of C&D only materials at the Industrial Carting MRF amounted to 14.9% in 2009 and 16.66% in 2010"—rates which "are well below industry standards for comparable C&D MRF operations in the Sacramento - San Francisco - San Jose area." Finally, the Report concluded that "[t]he difference between the recycling diversion rates reported to the jurisdictions by Industrial Carting and the rates we calculated at its MRF should be further explored and analyzed."

The Industrial Carting public reports attached to and summarized in defendants' Report, the authenticity of which plaintiff does not dispute, contain charts indicating: (1) for Santa Rosa, the tonnage of "Construction and Demolition Debris" Industrial Carting collected for 2009 and 2010 was exactly the same as the tonnage reported as "*Total Recycled*," and a "*Total Disposed*" tonnage of "0" and a "*Recycling Rate*" of "100%" was reported for both years; (2) for Rohnert Park, the "Total Tons Collected and Removed" for the periods 2008–2009 and 2009–2010 was the same as the "*Total Tons Collected and Removed for Recycling*," and the "*Total Tons Collected and Removed for Disposal*" was reported as "0"; (3) for Petaluma, for seven of the eight quarters in 2009 and 2010, Industrial Carting reported the same number of "Total Tons Collected" as "*Total Tons Diverted*," and it reported "*Total Tons Disposed*" as "0"; its reported

4

"*Diversion Level* (%)," which it defined as "Tonnage diverted from disposal divided by tonnage collected, multiplied by 100," was reported to be "100%"; (4) for Windsor, for 2009, Industrial Carting reported collecting 72.78 tons of debris, of which 8.95 tons was *disposed in a landfill* and the remaining 63.83 tons were "*Diverted.*" Based on those figures, it reported a "*Diversion Rate*" of 88 percent for that year. The phrase "*Diversion Rate*" was footnoted with the explanation: "Calculated as the total tons collected and sold or delivered for reuse, recycling, composting or processing, net of all residue, divided by the total tons collected."

We pause here to discuss the terms "diversion," "recycling" and the phrase "diversion rate," which are used in defendants' Report and in plaintiff's public reports. The Act defines the terms "[r]ecycle" and "recycling" to mean "the process of collecting, sorting, cleansing, treating, and reconstituting materials that would otherwise become solid waste, and returning them to the economic mainstream in the form of raw material for new, reused, or reconstituted products which meet the quality standards necessary to be used in the marketplace." (Pub. Res. Code, § 40180.) As defendants point out, the Act defines "[d]iversion" to mean "activities which reduce or eliminate the amount of solid waste from solid waste disposal." (Pub. Res. Code, § 40124.)[6] The Act defines "solid waste disposal" as "the final deposition of solid wastes onto land, into the atmosphere, or into the waters of the state." (Pub. Res. Code, § 40192, subd. (a).) "Thus," defendants contend, "it is clear that 'diversion' refers to activities that will reduce the overall amount of waste that ends up in landfills each year—for example, source reduction, recycling, reuse and composting activities." Assuming defendants used

---

[6] See also Pub. Res. Code, § 40127 ("Diversion program" means "a program in the source reduction and recycling element of a jurisdiction's integrated waste management plan . . . that has the purpose of diverting solid waste from landfill disposal or transformation through source reduction, recycling, and composting activities"); *id.*, § 40507, subds. (c)(3)(E), (c)(4)(A), (c)(4)(B) & (c)(6)(D) (referring to "the amount of waste diverted from disposal sites," "materials diverted from solid waste facilities," "materials that are diverted from disposal facilities through source reduction, recycling, and composting" and "the number of tires that are recycled or otherwise diverted from disposal in landfills or stockpiles").

5

the term "diversion" in their report in accordance with its statutory definition, it becomes apparent that their use of the phrase "diversion rate" meant the percentage of waste material collected by a company like plaintiff that was recycled, reused or composted and thereby kept out of the landfill.[7] As we discuss below, plaintiff contends its use of these and other terms in its reports to public agencies had different meanings of which defendants should have been aware.

Defendants provided the Report to North Bay, but did not give it to any government entity or employee. However, North Bay presented the Report to the Novato Sanitary District (the District) at a board meeting that defendant Murphy attended at North Bay's request. Murphy did not present at the meeting but was there to answer questions if the Board had any. Prior to that meeting, Industrial Carting had engaged in discussions with the District about opening its debris box services franchise to Industrial Carting, or to open market competition, in view of the upcoming expiration of North Bay's contract with the District, which apparently was exclusive. Following the submission of the Report, the District entered an exclusive agreement with North Bay and declined to allow plaintiff to compete in the debris box and C&D part of the business.

In June 2012, Industrial Carting, Global Materials and their principals filed their complaint. It focused on a former employee of both Industrial Carting and Global Materials named Ernie Carpenter, who is not a party to the appeal. Initially, Carpenter was the only named defendant and was sued along with 20 unnamed Does. The complaint alleged that Carpenter, in violation of a nondisclosure agreement he signed, and after he left Industrial Carting's and Global Materials' employ, disclosed confidential information about their businesses to their competitors. He allegedly falsely reported

---

[7] While not separately defined, the phrase "diversion rate" is used at least once in the Act and from its context evidently means the percentage of solid waste diverted from landfill. (See Pub. Res. Code, § 40004, subd. (a)(3) [the provisions in existing law that confer broad discretion on local agencies to determine aspects of solid waste handling that are of local concern "have significantly contributed to the statewide diversion rate exceeding 50 percent, and further progress toward decreasing solid waste disposal requires that this essential element of local control be preserved"].)

6

permit and water quality violations at their facility to the City of Santa Rosa, resulting in their being investigated by Sonoma County, and allegedly commissioned a report (bearing the same title as the Report) that made "numerous" unspecified "false statements" about Industrial Carting's business, along with statements that "were true but which were represented in such a way as to cast [plaintiff] in a false light." His report was "intentionally distributed to harm the reputation of [plaintiff], in the business of refuse and recycling and in the communities in which [plaintiff] compete[s] with [his] clients." Carpenter allegedly solicited plaintiff's competitors claiming he had confidential information about plaintiff and Global Materials that made him valuable as a consultant. The complaint asserted causes of action for breach of employment contract, breach of the duty of loyalty, negligent and intentional interference with contract and prospective economic advantage, trade libel, defamation, trade secret misappropriation and unfair competition. Eventually, Industrial Carting, Global Materials and their principals named Murphy and IntelliWaste as "Doe" defendants. The complaint did not mention either Murphy or Intelliwaste by name.

The complaint contained two other allegations of false statements that are even less enlightening. It alleged that defendants had "made false and defamatory statements regarding [plaintiff]" and "[plaintiff's] products and services, and use of the Subject Property," and "knew such statements were false at the time they were made." Nowhere did the complaint quote or otherwise identify the statements plaintiff alleged were false, defamatory and otherwise actionable.

Defendants filed a timely motion to strike the entire complaint against them under the anti-SLAPP statute, section 425.16. Industrial Carting opposed the motion.[8] It stated that the only causes of action it was asserting against Murphy and Intelliwaste were for

---

[8] At the hearing on the motion, counsel for Industrial Carting contended the opposition was filed on behalf of both Industrial Carting and Global Materials, but the memorandum of points and authorities reflected only that counsel was representing Industrial Carting. The trial court concluded that only Industrial Carting had opposed the motion. It therefore granted the motion in its entirety as to plaintiff Global Materials, as well as to the individual plaintiffs who likewise failed to oppose the motion.

defamation, trade libel, negligent and intentional interference with prospective economic interest and unfair competition. After a hearing followed by supplemental briefing, the trial court issued a written order. It held that defendants met their burden on the threshold issue of whether the challenged causes of action arose from protected activity within the meaning of the anti-SLAPP law. It then held that plaintiff made a prima facie showing of facts that would support a judgment in its favor as to the defamation, trade libel, negligent interference and unfair competition claims against defendants, but not as to the intentional interference claim. In so holding, it rejected defendants' argument that plaintiff was a "limited purpose public figure" under the First Amendment case law and was therefore required to prove, in addition to the other elements of its claims, "actual malice." It therefore denied the motion as to all but the intentional interference claim, as to which it granted the motion on the ground that plaintiff failed to make a prima facie showing that defendants intended to disrupt plaintiff's potential relationship with the City of Novato.

Defendants timely appealed.

## DISCUSSION

Not surprisingly, defendants agree with the trial court's ruling that they met their burden to show the causes of action plaintiff asserts against them fall within the protection of the anti-SLAPP law. Specifically, they argue the statements in the Report that are at the crux of all of plaintiff's claims against them fall within section 425.16, subdivision (e)(2) because they were " 'made in connection with an issue under consideration or review by a legislative [or] executive . . . body.' " Further, defendants argue the statements fall within section 425.16, subdivision (e)(4) because they were made " 'in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest.' "

Defendants part ways with the trial court at the second prong of the anti-SLAPP analysis, under which, if a court concludes the claims arise from activity protected under section 425.16, subdivision (e), it must then determine whether a plaintiff has shown a probability of prevailing on the merits of those claims. (*Oasis West Realty, LLC v.*

8

*Goldman* (2011) 51 Cal.4th 811, 819–820.)[9] Defendants challenge the trial court's holding that plaintiff made the requisite showing of probability of success on the merits. They contend plaintiff failed to demonstrate the falsity of any of defendants' statements. They also argue that the trial court erred in concluding plaintiff is not a public figure and thus was not required to show malice, and argue that plaintiff failed to make a prima facie showing of malice.

Plaintiff contends that the anti-SLAPP statute does not protect the Report because the Report is commercial speech, arguing that while there is no case so holding, our Supreme Court's decision in *Vegod Corp. v. American Broadcasting Companies*, *Inc.* (1979) 25 Cal.3d 763 (*Vegod*) supports its position. Plaintiff devotes the remainder of its brief to arguments in defense of the trial court's determinations that it met its burden of showing it had a probability of prevailing on its claims, including that it is not a public figure and is not required to prove malice, that there was in any event sufficient evidence of malice and that it made the required showing that the statements in the Report were susceptible to being proven false and defamatory. Plaintiff also contends it was defendants' burden to establish that their statements were truthful and that they failed to meet that burden.

## I.

### *The Anti-SLAPP Statute*

In its two most recent decisions on the subject, the California Supreme Court described the analysis of a motion brought under the anti-SLAPP law. "California's anti-SLAPP statute provides that '[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech . . . shall be subject to a special motion to strike, unless the court determines . . . there is a probability that the plaintiff will prevail on the claim.' (§ 425.16, subd. (b)(1).)" (*Baral v. Schnitt*, *supra*, 1 Cal.5th at p. 381.) "The anti-SLAPP statute does not insulate defendants from

---

[9] The California Supreme Court recently clarified *Oasis West Realty* in regard to an issue not relevant here. (See *Baral v. Schnitt* (2016) 1 Cal.5th 376, 388–392.)

*any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity. Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by section 425.16. [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Id.* at p. 384.)

Regarding the first step, "[t]he Legislature spelled out the kinds of activity it meant to protect in section 425.16, subdivision (e): 'As used in this section, "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.' " (*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 422 (*City of Montebello*).) "Because of these specifications, courts determining whether a cause of action arises from protected activity are not required to wrestle with difficult questions of constitutional law, including distinctions between federal and state protection of free expression. 'The only means specified in section 425.16 by which a moving defendant can satisfy the requirement is to demonstrate that the defendant's conduct . . . falls within one of the four categories described in subdivision (e), defining subdivision (b)'s phrase, "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue." ' " (*Ibid.*) Thus, "courts determining whether conduct

10

is protected under the anti-SLAPP statute look not to First Amendment law, but to the statutory definitions in section 425.16, subdivision (e)." (*Ibid.*)

The court has "described [the] second step as a 'summary-judgment-like procedure.' [Citation.] The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.] '[C]laims with the requisite minimal merit may proceed.' " (*Baral v. Schnitt*, *supra*, 1 Cal.5th at pp. 384–385, fn. omitted.) "The plaintiff need only state and substantiate a legally sufficient claim." (*City of Montebello*, *supra*, 1 Cal.5th at p. 420.)

We review anti-SLAPP rulings de novo. (*Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 464 (*Hecimovich*); *Lanz v. Goldstone* (2016) 243 Cal.App.4th 441, 458.)

## II.

### *Defendants' Statements Fall Within the Protection of the Anti-SLAPP Law.*

### A. The Report is Speech in Connection with a Public Issue or an Issue of Public Interest Within the Meaning of Section 425.16, Subdivision (e)(4).

As already noted, defendants invoke two categories set forth in section 425.16, subdivision (e) in support of their argument that the anti-SLAPP statute applies: subdivision (e)(2), which protects statements "made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law," and subdivision (e)(4), which protects "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." First, defendants contend that the issue of "diversion rates of various Northern California companies engaged in solid waste collection and recycling," which the Report addressed, is "under *constant* review by governmental bodies—both locally and at the state level." This is so, they argue, because waste hauling and processing companies are heavily

11

regulated at both the state and local level, which regulations include requirements to submit quarterly and annual reports to state and local government entities. Second, defendants contend the Report constitutes "speech in connection with an issue of public interest," as reflected by the Legislature's adoption of laws governing recycling and diversion and by lawsuits and articles addressing those issues. Because, for the reasons we discuss below, we conclude defendants met their burden to show their statements concern a matter of public interest and thus fall within section 425.16, subdivision (e)(4), we need not reach their further argument that the statements were made in connection with review by a government body or official proceeding within the meaning of section 425.16, subdivision (e)(2).

As defendants point out, the subject of limited landfill capacity and the environmental effects of waste disposal in landfills are issues of significant interest to both municipal governments and the State of California. This interest is manifest from the fact that each of the municipalities requires hauling and recycling companies to obtain a license or franchise, to achieve a minimum diversion rate for C&D waste and to submit periodic reports demonstrating compliance. The State of California also heavily regulates recycling and solid waste (see Pub. Res. Code, §§ 14500–14599, 40000–70031 et seq.), has declared a goal of reducing, recycling and reusing solid waste to preserve landfill capacity and serve other environmental interests (*Id.*, §§ 40000, subd. (e), 41780; see also *id.*, § 40004) and has set goals and standards for diversion of waste. (*Id.*, §§ 41780, 41780.01, subd. (a).) The Legislature has repeatedly amended the Act since its enactment, including in recent years. (E.g., Stats. 2016, ch. 368 (Sen. Bill No. 859) §§ 12, 13 [re loan program for, inter alia, activities that expand and improve waste diversion and recycling, including food waste prevention]; Stats. 2015, ch. 596 (Assem. Bill No. 1045) § 3 [re environmental standards for composting facilities]; Stats. 2014, ch. 609 (Assem. Bill No. 2355) § 1 [re standards for recycled paving, base and backfill materials].) This degree of government involvement and oversight on an ongoing basis demonstrates widespread public interest in the subjects of solid waste recycling, diversion and disposal. (Cf. *Cross v. Cooper* (2011) 197 Cal.App.4th 357, 377 [legislative

12

findings, enactment of statute, and notice requirements reflect heightened concern and public interest in subject addressed by statute].)

The Report shed light on these subjects, including whether and to what degree waste hauling companies in Sonoma County were meeting government standards. The Report derived its data from public reports the service providers, including plaintiff, were required by local government to prepare. The Report was not solely focused on plaintiff or its services; rather, it derived, stated and commented on diversion rates reported by the three governmentally authorized providers of construction, debris hauling and recycling services in four Sonoma County municipalities. According to the Report, more than 12,000 tons of C&D waste were hauled by the three companies for the four municipalities combined in 2009 and more than 15,000 tons in 2010. This is not an insignificant volume of waste. We conclude that whether plaintiff and other providers were diverting the amounts of waste they claimed to be diverting away from landfills by means of recycling or reuse was of significant interest to Sonoma County's local government bodies and their citizens.

Plaintiff argues the Report is exempt from the anti-SLAPP statute under section 425.17, subdivision (c) and that the appellate court in *All One God Faith, Inc. v. Organic & Sustainable Industry Standards, Inc.* (2010) 183 Cal.App.4th 1186 (*All One God Faith*) held that speech critical about a commercial product is not in connection with a public interest for purposes of section 425.16, subdivision (e)(4).[10] It contends the

_____

[10] Plaintiff describes *All One God Faith* as holding "a manufacturer's language about a commercial product are [*sic*] **not** subject to the protection of CCP §425.16." In that case, the issue was whether use of a seal of organic certification on products of members of the trade association that created the seal constituted speech in connection with an issue of public interest. (See *All One God Faith*, *supra*, 183 Cal. App.4th at pp 1193–1194, 1200.) The trade association argued the use of its seal was speech in furtherance of a public concern about what standards should be met before a product can be labeled "organic." (See *id*. at pp. 1202–1203.) The court rejected the argument not because the speech was commercial but because the defendant's certification activities did not constitute "conduct in furtherance" of the formulation of the standard, and it was the latter that was an issue of public interest. (*Id*. at pp. 1200, 1203–1204.)

Report was "essentially a commercial advertisement" that cannot satisfy the public interest requirement because there was no "existing controversy or public debate relating to [plaintiff's] diversion rates" when the Report was prepared.

However, plaintiff failed to argue in the trial court that the Report did not fall within subdivision (e)(4). It argued only that its claims based on defendants' statements were exempt from the anti-SLAPP statute under section 425.17, subdivision (c)—an argument that it raises again on appeal and that we address below. Further, its argument about the public interest category of protected conduct, made for the first time on appeal, consists of only a few paragraphs tucked into its argument about the section 425.17, subdivision (c) exemption, with no separate heading and no clear indication that it means to contest the trial court's determination that defendants' speech was on a subject of public interest. Further, its briefing on the issue is less than adequate, in that it cites but a single case, *All One God Faith* (which does not support its position), and fails to discuss the substantial body of case law addressing the anti-SLAPP statute's public interest category. For all of these reasons, plaintiff has waived the argument and we disregard it on that ground. (*People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 [rejecting arguments asserted "perfunctorily . . . without development and . . . without a clear indication they are intended to be discrete contentions"]; *Noble v. Draper* (2008) 160 Cal.App.4th 1, 7, fn. 2 ["We disregard points not adequately briefed"]; *Kelly v. CB&I Constructors, Inc.* (2009) 179 Cal.App.4th 442, 451–452 [failure to raise issue in trial court or in briefs on appeal].)

But even if we were to consider this too-little and too-late argument, we would reject it. Whether speech has a commercial or promotional aspect is not dispositive of whether it addresses a matter of public interest. (See, e.g., *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 894, 898–901 [statements by defendant author on website used to promote her books encompassed matters of public interest]; *Computer Xpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1007–1008 [statements by defendants on website regarding publicly traded corporation concerned public issue]; *DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562, 567 [pharmaceutical

14

company's statements regarding its drug, used by millions for a serious condition, were statements on issue of public interest].) As we stated in *Hecimovich*, *supra*, 203 Cal.App.4th 450: "Like the SLAPP statute itself, the question whether something is an issue of public interest must be ' " 'construed broadly.' " ' [Citations.] An ' " 'issue of public interest' " ' is ' "*any issue in which the public is interested.*" ' " (*Id*. at pp. 466–465.) "[T]he term has been broadly construed to include private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity." (*Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 737.)

Further, plaintiff cites no case, nor are we aware of any, supporting its position that an existing controversy is necessary for speech to be on a matter of public interest. The commonly articulated definitions of "statements made in connection with a public issue" are not limited to speech made in the context of an ongoing controversy. "The first category comprises cases where the statement or activity precipitating the underlying cause of action was 'a person or entity in the public eye.' [Citation.] The second category comprises cases where the statement or activity precipitating the underlying cause of action involved 'conduct that could affect a large number of people beyond the direct participants.' [Citation.] And the third category comprises cases where the statement or activity precipitating the claim involved 'a topic of widespread, public interest.' " (*Cross v. Cooper*, *supra*, 197 Cal.App.4th at p. 373, fns. omitted.) None of these categories necessitates a showing of prior controversy. To be sure, the existence of a controversy could indicate a topic is one of public interest. But it is only one relevant factor and is not essential to such a finding.

## B. The Report is Not Exempt as a Representation by a Service Provider to a Customer or in a Regulatory Proceeding About Its Own or Its Business Competitor's Services Within the Meaning of Section 425.17, Subdivision (c).

We next address an argument plaintiff did make in the trial court and renews here, specifically its invocation of section 425.17, subdivision (c). That section creates an exemption from the anti-SLAPP statute, as pertinent here, for causes of action brought against persons "primarily engaged in the business of selling . . . services . . . arising from

any statement or conduct by that person" if both of the following conditions exist: "(1) The statement or conduct consists of representations of fact about . . . a business competitor's business operations, . . . or services, that is made for the purpose of obtaining approval for, promoting, or securing sales . . . of, or commercial transactions in, the person's goods or services"; and (2) "The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer, or the statement or conduct arose out of or within the context of a regulatory approval process, proceeding, or investigation, . . . notwithstanding that the conduct or statement concerns an important public issue." (§ 425.17, subd. (c).)

Although it invokes the exception, plaintiff concedes defendants' speech "does not meet all the requirements of CCP §425.17." It acknowledges that "defendants were not in the business of waste management." Thus, plaintiff was not a "business competitor" of defendants as required by section 425.17, subdivision (c). Nonetheless, plaintiff urged the trial court, and requests us, to exclude its causes of action from the anti-SLAPP statute because, it contends, in making the statements defendants were "acting as North Bay's agent," North Bay was a competitor of plaintiff, and "defendants' statements were commercial in nature." While further acknowledging there is "no case directly on point," plaintiff cites *Vegod*, *supra*, 25 Cal.3d 763 for the proposition that "speech constituting 'criticism of commercial conduct' . . . does not deserve the special protection of the First Amendment."

Plaintiff overstates the holding in *Vegod*, which was not that commercial speech critical of another's services was entitled to *no* First Amendment protection but only that it did "not deserve the special protection of the actual malice test." (*Vegod*, *supra*, 25 Cal.3d at p. 770.) That test is not relevant here. Further, *Vegod* was not an anti-SLAPP case, and the protections afforded by the anti-SLAPP statute are not coextensive with the categories of conduct or speech protected by the First Amendment or its California counterparts (Cal. Const., art. I, §§ 2–4). As our high court recently reaffirmed, "courts determining whether conduct is protected under the anti-SLAPP

16

statute look not to First Amendment law, but to the statutory definitions in section 425.16, subdivision (e)." (*City of Montebello*, *supra*, 1 Cal.5th at p. 422, citing *Equilon Enterprises v. Consumer Cause, Inc*. (2002) 29 Cal.4th 53, 66.) The same is true with respect to the determination whether conduct is exempt from the statute; courts must look not to general First Amendment law, but to the statutory exemptions defined in section 425.17, subdivisions (b) and (c).

Section 425.17, by its terms, is limited to statements by one business competitor about the products or services of another, and requires that the statements be made "for the purpose of" promoting sales of the speaker's products. North Bay apparently was a competitor of plaintiff's and may well have commissioned the Report for the purpose of promoting *its* services, but that does not make *defendants* business competitors of plaintiff.[11] Nor did plaintiff show that defendants' purpose was to promote North Bay's services, or their own, or that they had any purpose other than providing the review and analysis they had been hired and were being paid to provide. Plaintiff also did not show that defendants' intended audience was anyone other than North Bay.

Nor has plaintiff demonstrated that defendants were agents of North Bay in making their statements. It is undisputed that they provided the Report only to North Bay. They were not requested to and did not provide the Report to any public agency or anyone else on North Bay's behalf.[12] Nor did defendants have an ongoing relationship with North Bay; they did not work for it before or after preparing the Report. In short,

---

[11] Murphy testified that the business of IntelliWaste is "operational and financial review and analysis of solid waste management systems, collection, recycling and disposal."

[12] True, Murphy attended a meeting with the Novato Sanitary District at North Bay's request, but he made no presentation and, although he was available in the audience to answer questions about the Report if any were posed, there was no evidence that he was called on to do so. Even if this evidence were sufficient to establish that Murphy acted as North Bay's agent at the meeting, an issue we need not decide, plaintiff does not base its claims on any alleged statements made by Murphy at the meeting. And again, although the Report was apparently presented at the meeting, it was not presented by Murphy.

17

plaintiff fails to establish an agency relationship between defendants and North Bay with regard to the statements made by defendants to North Bay in the Report.

Finally, even if plaintiff could establish an agency relationship, its argument in effect asks us to expand the exemption for business competitors beyond the terms expressly afforded by the State Legislature, or at the very least to interpret the exemption broadly. This we cannot do. Because section 425.17, subdivision (c) is a statutory exemption from section 425.16, it should not be interpreted expansively, much less expanded beyond its terms. Rather we must construe it narrowly. (*Simpson Strong-Tie Co. v. Gore* (2010) 49 Cal.4th 12, 22, 26–33 [rejecting argument that attorney's advertisement stating owners of decks using screws manufactured by plaintiff might have right to compensation was exempt from anti-SLAPP motion under section 425.17, subdivision (c)].)

In a case cited by plaintiff for another proposition, the court rejected an argument similar to plaintiff's that it should read section 425.17, subdivision (c) as applying not only to "a person primarily engaged in the business of selling or leasing goods or services," as the statutory language requires, but also "to 'someone acting on behalf of' a person primarily engaged in the business of selling or leasing goods or services." (See *All One God Faith*, *supra,* 183 Cal.App.4th at p. 1213.) The court observed that if the Legislature had intended to encompass such persons it "easily could have said so." (*Ibid*.) "The Legislature clearly understood how to broaden the application of section 425.17. In subdivision (c)(2), for example, the statute provides: 'The intended audience is an actual or potential buyer or customer, *or a person likely to repeat the statement to, or otherwise influence,* an actual or potential buyer or customer . . . .' (Italics added.) The absence of similarly inclusive language in subdivision (c) is an indication that the Legislature did not intend the exception to apply to persons acting on behalf of 'a person primarily engaged in the business of selling or leasing goods or services . . . ' " (*Id.* at pp. 1213–1214.)

The same logic applies here. The statutory exemption covers "a person primarily engaged in the business of selling or leasing goods or services" who makes

18

representations of fact about its own "or a business competitor's business operations, goods, or services." (§ 425.17, subd. (c)(1).) The Legislature could easily have expanded the section to include an "agent" or a "person acting on behalf of" the "person primarily engaged in the business of selling or leasing goods or services." The absence of such language indicates the Legislature did not intend to encompass such persons within the exemption.

We conclude that the Report and the statements it contains do not fall within the exemption from the anti-SLAPP statute set forth in section 425.17, subdivision (c).

## III.

### *Plaintiff Failed to Demonstrate Probability of Success on the Merits.*

Defendants having satisfied their threshold burden to show plaintiff's causes of action arise from acts in furtherance of the right of free speech within the meaning of the anti-SLAPP statute, the burden shifts to plaintiff to demonstrate a probability of prevailing on its claim. (*Vogel v. Felice* (2009) 127 Cal.App.4th, 1006, 1017 (*Vogel*); § 425.16, subd. (b)(1).) To meet that burden, plaintiff " 'must " 'state[ ] and substantiate[ ] a legally sufficient claim.' " [Citations.] Put another way, the plaintiff "must demonstrate that the *complaint is both legally sufficient* and *supported by a sufficient prima facie showing of facts* to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' " (*Vogel*, at p. 1017.) We consider "the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) However, we neither " ' "weigh credibility, [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." ' " (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)

While a plaintiff's burden has been described as " 'not high' " and as requiring a showing of " 'minimal merit,' " plaintiff must demonstrate that its claim is "legally sufficient" *and* "that it is supported by a sufficient prima facie showing, one made with 'competent and admissible evidence.' " (*Hecimovich*, *supra*, 203 Cal.App.4th at p. 469.)

19

"[I]t is not sufficient that plaintiffs' complaint survive a demurrer. Plaintiffs must also substantiate the legal sufficiency of their claim." (*DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562, 568; see *Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192 [under section 425.16, the trial court "evaluates the merits of the lawsuit using a summary judgment-like procedure at an early stage of the litigation"].) Again, our review is de novo. (*Lanz v. Goldstone*, *supra*, 243 Cal.App.4th at p. 458.)

The complaint here, at least in regard to some of its claims, is patently insufficient to withstand even a demurrer.[13] While the deficiencies in its complaint mean plaintiff "failed to establish the requisite likelihood that [it] could prevail on the merits if allowed to proceed with the lawsuit" (*Vogel*, *supra*, 127 Cal.App.4th at p. 1019), here, as in *Vogel*, "this point was never clearly raised by defendant as a distinct ground for dismissal." (*Ibid.*) Even on appeal, defendants raised this issue for the first time in their reply brief. We will therefore follow the path taken by the *Vogel* court and avoid reliance on the obvious inadequacy of plaintiff's complaint, and "proceed to consider whether

---

[13] " 'The general rule is that the words constituting an alleged libel must be specifically identified, if not pleaded verbatim, in the complaint.' " (*Vogel*, *supra*, 127 Cal.App.4th at p. 1017, fn. 3.) Plaintiff's complaint fails to set forth any of the statements that form the basis for its claims against defendants, and instead asserts in the most conclusory fashion that unidentified defendants made "numerous" unspecified "false statements" about plaintiff's business, along with statements that "were true but . . . cast [plaintiff] in a false light." Such vague and conclusory allegations are not even minimally adequate to state a claim for defamation. (*Comstock v. Aber* (2012) 212 Cal.App.4th 931, 948 [to plead cause of action for slander plaintiff "must set forth 'either the specific words or the substance of' the allegedly defamatory statements. [Citation.] An allegation 'of a "provably false factual assertion . . ." . . . is indispensable to any claim for defamation' "]; see also *Vogel*, *supra*, at p. 1017, fn. 3; *Hecimovich*, *supra*, 203 Cal.App.4th at pp. 457 & fn. 1, 470.) Some, if not all, of plaintiff's other causes of action are also deficient. For example, the interference with contract and prospective economic advantage claims are unsupported by any allegation that plaintiff had a valid contract or economic relationship with a third party that was reasonably probable to produce a future economic benefit, much less that defendants' statements resulted in the breach of such contract or disruption of the economic relationship. (See Witkin, Cal. Procedure (5th ed. 2008) Pleading §§ 772, 774, pp. 186, 190.)

plaintiff[] carried [its] burden of showing an ability to *prove* [its] case on the merits." (*Ibid.*)

Defendants make basically two arguments:  that plaintiff failed to show the statements in the Report are false or that defendants acted with actual malice in making those statements.  As a general matter, a defamation claim does not require a plaintiff to plead or prove falsity or malice.  (*Lipman v. Brisbane Elementary Sch. Dist.* (1961) 55 Cal.2d 224, 233; 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 745, p. 164, citing *Davis v. Hearst* (1911) 160 Cal. 143, 155.)  However, where the communication involves a matter of public concern, the plaintiff does bear the burden of pleading and proving falsity.  (*Philadelphia Newspapers v. Hepps* (1986) 475 U.S. 767, 776–779; see *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 753, fn. 37 [noting *Philadelphia Newspapers* partially abrogated holding in *Lipman* by imposing burden of proof as to truth or falsity on plaintiff "when the communication involves a matter of public concern"].)[14]  Further, in trade libel cases, a plaintiff seeking damages must prove that the allegedly disparaging statement is false in any event.  (*City of Costa Mesa v. D'Alessio Investments, LLC*, *supra*, 214 Cal.App.4th at p. 378; *Guess, Inc. v. Superior Court* (1986) 176 Cal.App.3d 473, 479.)  Plaintiff's other tort claims, which have as their "gravamen . . . the alleged injurious falsehood of [defendants' statements]," are subject to the same First Amendment protections as its defamation claim.  (See *Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1042; *Hofman Co. v. E.I. du Pont de Nemours & Co.* (1988) 202 Cal.App.3d 390, 403, abrogated in part on other grounds as recognized in *Kahn v. Bower* (1991) 232 Cal.App.3d 1599, 1606–1608.)

---

[14] While *Philadelphia Newspapers* involved media defendants, California courts have consistently applied its holding to any plaintiff whose defamation claim is based on statements related to issues of public concern, including nonmedia defendants. (*City of Costa Mesa v. D'Alessio Investments, LLC* (2013) 214 Cal.App.4th 358, 378–380; *Integrated Healthcare Holdings v. Fitzgibbons* (2006) 140 Cal.App.4th 515, 529; *Nizam-Aldine v. City of Oakland* (1996) 47 Cal.App.4th 364, 375; *Fashion 21 v. Coalition for Humane Immigrant Rights of Los Angeles* (2004) 117 Cal.App.4th 1138, 1150.)

We have already considered and rejected plaintiff's argument that defendants' statements did not address matters of public concern.  Because we conclude that it did, plaintiff has the burden of proving the falsity of the statements it contends are tortious.  We turn now to whether it has met that burden.  In evaluating this question, we are mindful that the requisite showing need not be overwhelming or even strong.  But evidence of falsity must be minimally sufficient to support a verdict in a plaintiff's favor on the point.  (*Taus v. Loftus* (2007) 40 Cal.4th 683, 745 [plaintiff " ' "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited" ' "].)

As we have noted, plaintiff's complaint lacks any specification of the allegedly false statements on which plaintiff's tort claims against defendants are based.  However, plaintiff offered two declarations in the trial court that identify the statements it contends were false.  The declaration of Gary Liss, a self-described "Zero Waste consultant" who provided consulting services to Industrial Carting and Global Materials for "over 10 years," identifies as "false" three statements in defendants' Report.  The declaration does not quote the specific statements but paraphrases them.  We understand the declarant to be referring to the following statements in the Report:

(1)  "For 2009 and 2010, Industrial Carting reported C&D diversion of 87% for Windsor and 100% diversion with no disposal for the cities of Santa Rosa, Rohnert Park and Petaluma.  These numbers exceed industry standard benchmarks and we consider the data not credible without further detailed information from the company."  (2)  "For 2009 and 2010, based on information available from public records, we calculated the total facility diversion rate for the Industrial Carting MRF, regardless of which jurisdiction the material came from, as being 33.5% and 34.75%, respectively."

(3)  "Based on public documents we concluded that the diversion rate of C&D only materials at the Industrial Carting MRF amounted to 14.90% in 2009 and 16.66% in 2010."

22

The problem with the first statement, according to Liss, is that it "essentially states that [Industrial Carting] is falsely reporting and is lying about its diversion rates, and ignores that these are two separate entities." The problem with the second and third are that Industrial Carting "does not operate a MRF," and "[i]t is impossible to determine the [Global Materials] MRF facility diversion rate from the reports allegedly relied on by [defendants] or from other public records."

The declaration of Industrial Carting/Global Materials business manager Lisa Hardin, also submitted by plaintiff, likewise describes defendant Murphy's approach in calculating diversion rates as "fundamentally flawed, in that he is taking regulatory reporting from the two separate companies and for separate purposes, and treating them as if they were the same company and further makes the assumption that he has the total volume of materials hauled and processed by both companies. None of these assumptions are true." Hardin, too, claims "[i]t is impossible to derive a diversion rate for any of the municipalities which [Industrial Carting] serves by using the information and methodology he testified that he used," because, in effect, the Global Materials reports he used "include materials not collected in the franchise cities listed in the Intelliwaste Report."

The legal question we must address is what it means to prove falsity in this context. Defendants cite *Vogel*, *supra*, 127 Cal.App.4th 1006. There, the plaintiffs, Vogel and Grannis, were candidates for public office who claimed statements about them posted on the defendant's website were defamatory. (*Id*. at p. 1010.) In opposition to the defendant's anti-SLAPP motion, Vogel claimed the statement that he was " 'WANTED as a Dead Beat Dad' " and " 'owe[d] Wife and kids thousands' " (*id.* at p. 1012) was false " 'in that I do not owe my wife and kids thousands.' " (*Ibid*.) Grannis claimed the statement that he was " 'Bankrupt, Drunk & Chewin' tobaccy' " was " 'false and highly offensive in that I am not an alcoholic or chew tobacco.' " (*Ibid*.)

The Court of Appeal held Vogel and Grannis "failed to make a prima facie showing that the statements were substantially false." (*Vogel, supra*, 127 Cal.App.4th at p. 1021.) The plaintiffs "could not demonstrate their ability to succeed on the merits

23

without (1) identifying statements that conveyed a provably false and defamatory imputation, and (2) presenting evidence that the statements were in fact substantially false, i.e., diverged from the true facts in and to such manner and degree as to produce a more damaging effect on the mind of the reader than would the truth." (*Ibid*.) "Neither plaintiff came close to carrying this burden." (*Ibid*.)

Analyzing Vogel's evidence, the court explained: "The primary factual assertions identified by plaintiff Vogel as false were that he was a 'deadbeat dad' and 'wanted' as such, and that he 'owes Wife and kids thousands.' His only evidence concerning the true facts was the averment, 'I do not owe my wife and kids thousands.' This is a 'negative pregnant,' i.e., 'a denial of the literal truth of the total statement, but not of its substance.' (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 995, p. 451.) By denying a debt in a specified amount, it leaves open the possibility of a debt in some other, perhaps substantially equivalent, amount." (*Vogel*, *supra*, 127 Cal.App.4th at pp. 1021–1022.) "Further, the use of the conjunction 'and' in both the challenged statement and the denial raises a hosts of difficulties. In all likelihood the meaning of the challenged statement was that Vogel's combined debt to both his wife and children was at least $2,000. But the use of 'and' in Vogel's denial ('I do not owe my wife and kids thousands') could mean a number of things: (1) the combined debt to his wife and children is less than $2,000; (2) the debt to his children is less than $2,000, but the debt to his wife may be greater; or (3) the debt to his wife is less than $2,000, but the debt to his children may be greater. This ambiguity becomes all the more striking considering the presumptive ease with which Vogel could have stated the true facts, i.e., how much he owed, and when and how the debt, or portions of it, were discharged. Vogel's failure to plainly refute the defamatory imputation by stating the true facts may be understood to imply that he did in fact continue to owe substantial amounts of unpaid child support. Certainly it was insufficient to establish his ability to prove the substantial falsity of the imputations that he was a 'deadbeat dad' who 'owed thousands.' " (*Id.* at p. 1022, fn. omitted.)

The *Vogel* court's analysis of Grannis's declaration was similar: "Plaintiff Grannis tacitly admitted the substantial truth of describing him as 'bankrupt'; certainly he

24

did not deny that he had filed a bankruptcy petition as asserted in defendant's moving papers. And he failed to demonstrate any *substantial* falsity in the characterization 'Drunk and Chewin' tobaccy.' He described this characterization as false, but never stated the true facts to which the statement would have to be compared in order to establish its *substantial* falsity. He denied being an alcoholic, but not that he consumed alcohol to the point of inebriation, or that he had done so often, or that he liked to do so. Similarly, he used only the present tense in denying that he chewed tobacco; for all the record shows, he might have chewed it in the very recent past, and might intend to chew it again in the future." (*Vogel*, *supra*, 127 Cal.App.4th at pp. 1022–1023.)

*Vogel* demonstrates that mere assertions that a statement is "false," even in sworn declarations, do not satisfy a plaintiff's burden to demonstrate falsity. As the court there put it, the "simple negation of the challenged statement fails to fairly meet its substance." (*Vogel*, *supra*, 127 Cal.App.4th at p. 1024, fn. 7.) More specifically, *Vogel* supports defendants' argument that, in order to make a prima facie showing the falsity of defendants' statement that Industrial Carting's reported diversion rates were "not credible,"[15] plaintiff was required to do more than it did.

Focusing on the first allegedly defamatory statement—that plaintiff's reported diversion rates of 100 percent for three municipalities and 87 percent for a fourth are not credible—plaintiff's declarants negated defendants' statements, saying they were false. They also described what they described as flaws in defendants' methodology. But they did not "fairly meet the substance" of defendants' statements that plaintiff's reported 100 percent and 87 percent rates were not credible. To do that, plaintiff would have to have provided some evidence of its actual diversion rates or at least some approximation of those rates. This is especially so given "the presumptive ease with which [plaintiff]

---

[15] We note that the statement in the Report was actually that defendants considered the reported rates "not credible without further detailed information from the company." Defendants do not argue that this qualification rendered the statements nonactionable, and we therefore do not discuss the issue.

25

could have stated the true facts" on that subject. (*Vogel*, *supra*, 127 Cal.App.4th at p. 1022.)

Without knowing the actual percentages of material Industrial Carting hauled that were in fact recycled or otherwise diverted from the landfill, we cannot determine whether defendants' assertion that the 100-percent and 87-percent rates plaintiff reported were not credible was "substantially false." For example, if 99 percent of the trash plaintiff hauled from Santa Rosa, Petaluma and Rohnert Park was in fact recycled or otherwise diverted from landfill, defendants' suggestion that its reported 100-percent rate was not credible would be substantially false. If on the other hand, only 65 percent of the trash plaintiff hauled from those jurisdictions was in fact diverted, then defendants' statement that Industrial Carting's reported rate of 100 percent was not credible would be quite accurate.

Neither the Liss declaration nor the Hardin declaration provide any information about the actual percentage of the waste Industrial Carting collected that was recycled or otherwise diverted from the landfill. Most significantly, these declarants do not state that 100 percent of the C&D waste material Industrial Carting hauled for Santa Rosa, Petaluma and Rohnert Park in 2009 and 2010 or 88 percent of the material it hauled for Windsor in 2010 was actually recycled or that none of it (or for Windsor only 12 percent) was ultimately disposed in a landfill. Yet neither do they dispute that Industrial Carting reported recycling and diversion rates of 100 percent and zero "disposal" for Santa Rosa, Petaluma and Rohnert Park in 2009 and 2010, and a rate of 88 percent for Windsor for 2009.

Plaintiff offers no evidence showing the tonnage or percentages of waste it collected that it reported as having been recycled, diverted and disposed were in fact recycled and diverted, as those terms are used in the Integrated Waste Management Act. As defendants point out, the statutory definitions of the terms "diversion," "recycling" and "disposal" are consistent with defendants' usage in their Report. As discussed above, the Act defines "divert" to mean to reduce or eliminate the amount of solid waste deposited in a landfill, and defines "recycle" to mean to sort, cleanse, and reconstitute

26

materials that would otherwise become solid waste, and return them as raw material for use in products.

Hardin states, however, that Santa Rosa, Petaluma and Rohnert Park permitted Industrial Carting to report 100 percent as recycled or diverted so long as it had "delivered" all of the debris it collected "to the [Global Materials] MRF for 'recycling' " such that it was "out of Industrial Carting's custody and control." In other words, defendants' Report is false, according to plaintiff, not because it questions whether plaintiff in fact recycled or diverted 100 percent of the C&D waste it hauled within the meaning of those terms used in the Act, but rather because it "misrepresented [the] *meaning*" of those terms *as used in Industrial Carting's reporting*. (Italics added.) Implicit in this accusation is that Industrial Carting's contracts with Santa Rosa, Petaluma and Rohnert Park permitted it to characterize as "recycled" and/or "diverted" waste material that was simply delivered to an MRF, whether that facility in fact recycled it or instead delivered it to a landfill, and that defendants knew or should have known of Industrial Carting's alternative usage of the terms "recycle" and "divert." Hardin also states that, by contrast to the other three cities Industrial Carting served, Windsor required it to "obtain the specific diversion rate achieved for the C&D materials collected in their jurisdiction by the separate recycling facility, [Global Materials]" and that the figures it reported to Windsor were "accurate." Again, however, the declaration does not indicate whether the entire 88 percent of C&D waste from Windsor that plaintiff reported as having been "Diverted" was in fact reused or recycled, or whether it was merely delivered to Global Materials or some other MRF for processing with some portion later ending up in the landfill.

These statements by Hardin do not demonstrate the Report was false. The Report does not purport to interpret Industrial Carting's contracts with the local governments; nor does it assert that plaintiff breached any of those contracts. Further, it attaches the specific Industrial Carting reports on which it is relying. Not only was the Report

27

transparent regarding defendants' sources,[16] it was transparent about defendants' methodology. It did not accuse Industrial Carting of false reporting. It did question the diversion and recycling rates reported by Industrial Carting, and in doing so assumed— according to plaintiff, inaccurately—that the use of the terms "disposed," "recycled" and "diverted" in Industrial Carting's public reports is consistent with their usage in the relevant statutes and, apparently, in the industry.[17] Plaintiff complains about this assumption but fails to explain why it was false.

Plaintiff's position boils down to this: Defendants took plaintiff's reports to mean that 100 percent of the C&D waste Industrial Carting had hauled from Santa Rosa, Petaluma and Rohnert Park in 2009 and 2010, and 88 percent of what it hauled from Windsor in 2009, was actually being recycled and diverted from the landfill. Instead, defendants should have divined that plaintiff's reports meant something quite different: that 100 percent and 88 percent of the waste had been delivered to a facility that would recycle or otherwise divert some, all, or none of it from landfill. Plaintiff has offered no evidence demonstrating that *its* usage of the terms "disposal," "recycle" and "divert" was common in the industry or that anyone other than plaintiff used the terms this way. Not even the expert whose declaration plaintiff submits has attested to any such meaning. Thus, plaintiff has failed to show the Report was false in its use of those terms.

In sum, plaintiff has failed to show that it in fact "recycled" or "diverted" 100 percent (or for Windsor, 88 percent) of the C&D waste it hauled or an amount representing percentages close to those it reported, as defendants used those terms in the Report. Nor has it shown that defendants' implicit interpretation of plaintiff's reports to local governments, to be using those terms according to their statutory meaning, was false or misleading. Plaintiff has thus failed to make a prima facie showing of the falsity of the Report's statement that plaintiff's reported diversion rates were not credible.

---

[16] As stated above, the Report summarized and included copies of plaintiff's public reports.

[17] The statutory definitions suggest a usage in the industry, as do the reports of other C&D waste hauling services attached to the Report.

28

We now turn to the second and third statements about which plaintiff complains: the Report's estimates of the diversion and recycling rates for the "Industrial Carting MRF" for 2009 and 2010 at 33.5 percent and 34.75 percent, respectively, and the diversion and recycling rates for C&D materials in particular were 14.90 percent and 16.66 percent for those years. Plaintiff has failed to show that defendants' estimates of the MRF's diversion and recycling rates are false.

Liss's declaration criticizes the Report for referring to the MRF as the "Industrial Carting MRF" when it is Global Materials, not Industrial Carting, that operates the MRF. Of course, that alone hardly renders the Report defamatory.[18] But the overarching point made in the Hardin and Liss declarations regarding Industrial Carting's operations is that, because the companies are engaged in separate businesses, because they haul (Industrial Carting) and process (Global Materials) waste from different sources, and because they are governed by, and report different information to, different government entities, "[i]t is impossible to derive a diversion rate for any of the municipalities which [Industrial Carting] serves by using the information [Murphy] used."

Plaintiff's criticism misses the boat by ignoring what the figures in the Report represent. The Report does not purport to "derive a diversion rate for any of the

---

[18] Defendants contend their estimates of the MRF's diversion rates are irrelevant to Industrial Carting's anti-SLAPP motion or this appeal because "the trial court partially granted the anti-SLAPP motion and dismissed all claims of Global Materials," which it did based on Global Materials' failure to oppose the motion. Moreover, Global Materials has not appealed from the dismissal of its claims.

As a general rule, "[a] defamation action may proceed only where the challenged statement conveys a meaning ' "of and concerning" the plaintiff.' " (*Vogel*, *supra*, 127 Cal.App.4th at p. 1023.) This limitation also applies to plaintiff's other tort claims. (*Ibid*.) To prevail on claims based on statements about Global Materials, which Industrial Carting has stated is a "separate entity," Industrial Carting would have to demonstrate that defendants "asserted [a] factual association between [their estimates of Global Materials' diversion rates] and plaintiff[']s], or that the [estimates] would be understood to refer to them in [some] way." (*Vogel*, *supra*, 127 Cal.App.4th at p. 1023.) We need not resolve this issue because we conclude that plaintiff has failed to satisfy its burden to establish the falsity of the estimates and the claims based on the estimates must be stricken on that ground.

29

municipalities which [Industrial Carting] serves"; rather, it states that "we calculated the *total facility* diversion rate for the Industrial Carting MRF, *regardless of which jurisdiction the material came from*." (Italics added.) It does not equate the "total facility diversion rate for the Industrial Carting MRF" with diversion rates for the waste Industrial Carting hauled under contract with municipalities; rather it states that "[t]he difference between the recycling diversion rates reported to the jurisdictions by Industrial Carting and the rates we calculated at its MRF *should be further explored and analyzed*." (Italics added.) This renders Hardin's criticism that the Global Systems reports defendants used do not reflect the diversion rates for particular jurisdictions or for materials received by the MRF from Industrial Carting alone irrelevant.

Further, as defendants point out, neither the Liss nor Hardin declaration states what the Global Materials MRF's actual diversion or recycling rates were—either for all materials or for C&D debris only—during the years in question. Instead, Hardin claims "the figures stated by Intelliwaste/Murphy are below the mandated diversion rates for municipalities and the [Global Materials] permit, are portrayed out of context and falsely make each of the companies look as if they are generally failing in the diversion work that they do." Indeed, Hardin's statement that the figures "are portrayed out of context" implies the estimates are accurate. The closest Hardin comes to saying the estimates are inaccurate is her assertion that "[e]ach company, independent of the other, during 2009 and 2010, met or exceeded any diversion rate" required by "the state or the [Global Materials] permit." This also falls far short. Without any explanation of how the "diversion goal required by the state or the [Global Materials] permit" relates to the estimates set forth in the Report, one cannot conclude that the estimates were "substantially false." Among other things, plaintiff makes no effort to demonstrate that the goals set by the state or Global Materials' permit targeted the same categories defendants estimated, i.e., "the total facility diversion rate for the Industrial Carting MRF, regardless of which jurisdiction the material came from" and "the diversion rate of C&D only materials at the . . . MRF." Even assuming they address the same categories, the degree to which the goals Hardin claims plaintiff met exceeded the diversion rates

30

defendants estimated is nowhere stated. If defendants' diversion rate estimates are only slightly below the permit goals, then they cannot be said to be "substantially false."

In short, by failing to provide any evidence of the truth regarding its own or the Global Materials MRF's diversion rates, plaintiff has likewise failed to show it can likely meet its burden to prove the Report " ' "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." ' " (*Vogel*, *supra*, 127 Cal.App.4th at p. 1021.)

In the end, plaintiff's showing fails to make out a prima facie case of falsity regarding defendants' estimated diversion rates. Plaintiff has failed to provide evidence sufficient to support a finding that defendants' estimates are substantially false. For this reason, plaintiff failed to carry its burden of substantiating a valid cause of action. Because this determination alone requires that the order denying the special motion to strike be reversed, we need not reach defendants' further argument that plaintiff was a limited purpose public figure and was therefore required to plead and prove malice.

## DISPOSITION

The order denying defendants' special motion to strike under the anti-SLAPP statute as to plaintiff Industrial Carting is reversed and this matter is remanded with directions to the trial court to grant the motion. Defendants shall recover their costs on appeal.

31

_____

                                    STEWART, J.


We concur.


_____
KLINE, P.J.


_____
MILLER, J.


_Industrial Waste & Debris Box Service, Inc. v. Murphy_ (A142388)

Trial Court:   Sonoma County Superior Court

Trial Judge:   Hon. Arthur A. Wick

Counsel:

Archer Norris, Douglas C. Strauss and Tiffany J. Gates for Defendant and Appellant.

Law Office of Herbert L. Terreri and Herbert L. Terreri; Law Office of Tadd C. Aiona and Tadd C. Aiona for Plaintiff and Respondent.