Filed 12/11/24  Hitt v. Hitt CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CHESTER HITT, | D083704 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. CIVSB2308875) |
| REBEKAH HITT, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Bernardino County, Joseph T. Ortiz, Judge.  Affirmed in part, reversed in part, remanded with instructions.

Kronenberger Rosenfeld, Jeffrey M. Rosenfeld and Leah Rosa Vulić for Defendant and Appellant.

David J. Greiner Law Corp., David J. Greiner, Ashton Stine and Kierre L. Coghill for Plaintiff and Respondent.

INTRODUCTION

Chester Hitt sued his former wife, Rebekah Hitt, for defamation based on statements made by Rebekah in three Facebook and Instagram posts. Rebekah filed a special motion to strike the complaint under the anti-SLAPP

statute, Code of Civil Procedure section 425.16,[1] claiming the statements were protected speech within the meaning of the statute. She appeals the trial court's order denying her motion.

We affirm in part and reverse in part. On our de novo review, we conclude the statements in two of Rebekah's social media posts qualified for protection under the public forum category of section 425.16, subdivision (e)(3). Because we further conclude Chester's claims for defamation based on the protected statements in these posts are time-barred, we direct the trial court on remand to strike those allegations. We affirm the trial court's order denying Rebekah's motion to strike the allegations based on statements in her third post, as Rebekah has failed to sustain her burden of proving they "furthered[ ] the discourse that makes an issue one of public interest." (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 151 (*FilmOn*).)

PROCEDURAL AND FACTUAL BACKGROUND

I.

*Chester's Complaint*

Rebekah and Chester were married on September 29, 2018 and separated on April 5, 2020. A stipulated judgment of dissolution was entered on April 22, 2021. Roughly two years later, on April 28, 2023, Chester sued Rebekah. In the operative complaint, he alleged two causes of action for defamation, one for libel per se and the other libel per quod. He alleged Rebekah defamed him in a series of social media posts. Four of the posts were made in late 2021. A fifth, longer post was made in 2023.

---

[1] Undesignated statutory references are to the Code of Civil Procedure. " 'SLAPP' is an acronym for 'strategic lawsuit against public participation.' " (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 381, fn. 1 (*Baral*).)

Chester alleged Rebekah's friends would have "reasonably understood" the statements in Rebekah's posts to refer to him and to assert he domestically abused her, illegally stole her intellectual property, and criminally defrauded her by causing her "to forfeit salary and retirement contributions." Chester alleged he "never abused anyone," he was "the true and rightful owner of the [i]ntellectual [p]roperty pertaining to all of his businesses," and he had "never violated any legal or ethical duty owing by him to [Rebekah]."

## II.

### *Rebekah's Social Media Posts*

Chester's complaint alleged five social media posts by Rebekah contained defamatory statements. Statements in three of those posts are at issue here.

The first post was to Facebook on December 11, 2021. It stated, "If you or someone you know is experiencing relationship abuse, help is available. The National Domestic Violence Hotline provides free, confidential support 24/7/365. Text 'START' to 88788, call 1-800-799-SAFE (7233), or chat online at TheHotline.org. [¶] #domesticviolencesurvivor." The post linked to a Rolling Stone article entitled, "Marilyn Manson: The Monster Hiding in Plain Sight." For this post, Rebekah chose the Facebook setting that allowed any member of the public to see it.

The second post was made about two weeks later. It consisted of a change Rebekah made to the public portion of her Instagram profile on or about December 27, 2021. Rebekah updated her biography to state she was a "Domestic Abuse Survivor." This post was also visible to any member of the public.

3

Rebekah's third post was made more than a year later and was not public.  It was to a restricted audience consisting of Rebekah's Facebook friends (as well as the friends of her friends if they chose to forward it), and her Instagram followers.  The post was placed on Instagram and Facebook on February 24, 2023.  It listed 10 lessons Rebekah said she had learned in 2020.  That was the year she and Chester had separated.

We quote Rebekah's third post verbatim here, and italicize the statements that Chester alleged to be defamatory:

> 2020 was a lightening rod in my life.  Lessons I learned:
>
> 1. *Just because someone doesn't hit you doesn't mean they are not an abuser or an addict: it can be emotional, psychological, financial, or relational….or all of the above.*  If they have something else in their life above you, as their partner, and they can not put it down, they are addicted: to attention, fame, their phone.  Pay attention.
>
> 2. If you see [a red flag] …. likely it is not a carnival: act accordingly.
>
> 3. *People want to ignore what you say about abuse, and it's because that means they have to sit with their own discomfort about the truth of an abuser. Doing nothing is being complicit. They have to live with that.*
>
> 4. You are stronger than you know and smarter than you give yourself credit for.
>
> 5. *If the blood, sweat, and tears ….countless hours….and intellectual property including social media and name of a business is never credited to you, you still know you were the catalyst.* That's all that matters.
>
> 6. Never be ashamed of someone who walked away and refused to change. Your people are out there that know your worth……and predators do not change.

7.  You have accomplished so much in such a short time: what was meant to destroy you, launched this chapter.

8.  *Focus on the gain:  don't focus on the lost salary from your professional career, potential relationships that were forgone, the retirement contributions you didn't get by being under a false pretense for years, and the years you gave to an idea that was a false one.* Be a better assessor of truth in the future.

9.  Your vindication is that Life has a way of sorting it out. Papa God has got you.

10.  Champions always rise . . . .

#whatsyourstory
#nurselife
#survivor
#realestateinvestor"

The complaint alleged this third, "Lessons I learned" post specifically referred to Chester.  It alleged Rebekah's friends and followers were aware she worked for him as his employee, and that her romantic relationship with him had ended when they separated in April 2020.  It alleged Rebekah's friends therefore would have reasonably understood the statements in this post to pertain to him.

III.

*Rebekah's Anti-SLAPP Motion and Supporting Evidence*

In July 2023, Rebekah filed an anti-SLAPP motion seeking to strike the complaint or portions of the complaint pursuant to section 425.16.  She claimed four of the allegedly defamatory statements identified in the complaint were protected speech because they "contributed to the public debate about domestic abuse," and there was no reasonable probability Chester could prevail on the merits of his defamation claims with respect to those particular four statements.  She asserted the posts "contribute[d] to the

discussion surrounding domestic abuse because they invite[d] discussion on identifying, responding to, and preventing abuse." She claimed, "she participated in and contributed to the public discourse by sharing her story and the general lessons she has learned in her life about domestic abuse."

In support of the motion, Rebekah filed a declaration that addressed each of the three posts. First, she attached a copy of the public post she made on December 11, 2021, which circulated the Rolling Stone article and provided contact information for the National Domestic Abuse Hotline. She averred the post "did not mention, reference, or otherwise concern" Chester.

Second, she asserted the purpose of identifying herself publicly as a "Domestic Abuse Survivor" in her Instagram biography "[i]n or around December 2021" was to "let others know that they are not alone and to encourage them to also speak out." She explained her identification as a domestic abuse survivor was true because she "suffered domestic abuse in previous relationships other than with [Chester.]" She also averred the statement "did not mention, reference, or otherwise concern" Chester.

Finally, Rebekah addressed the private "Lessons I learned" post she made on February 24, 2023. She asserted the third post was "presented . . . in the form of motivational statements written by [her]." She averred the statements "regarding domestic abuse" did not "mention, reference, or otherwise concern" Chester. (Italics added.) She did not address whether the other statements in the "Lessons I learned" post referred to him.

Chester opposed Rebekah's anti-SLAPP motion. He disputed Rebekah's contention that her statements were intended to increase awareness of "the horrors of domestic violence or contribute to the public discourse on the matter." He claimed the statements "were intended to

6

defame [him] by falsely alleging that [he] engaged in crimes of moral turpitude, that [he] was a domestic abuser, and that [he] was a thief in business through the stealing of business ideas." According to Chester, his friends and associates assumed the posts were about him, and "began approaching [him] and informed [him] about what was being said about [him]." He averred, "I have never domestically abused [Rebekah], was never accused of domestically abusing [Rebekah], and did not steal any of [Rebekah's] business ideas, or cause [Rebekah] to forgo her professional career."

Chester's opposition included a declaration by his friend Becky L., which attached a text message Rebekah allegedly sent Becky on June 3, 2020, shortly after Chester and Rebekah separated. In the purported text message, Rebekah stated Chester "abused, disrespected, and neglected her."[2]

The trial court denied Rebekah's motion to strike the complaint for two reasons. First, the court ruled, "[Rebekah] has not met her initial burden to establish that the challenged causes arise from protected activity. While domestic violence is a matter of public concern, the alleged statements are not *all* within the four corners of that topic." (Italics added.) Second, the court ruled in the alternative that the statements relating to domestic violence did not "further the public discourse."

The trial court explained, "not *all* of [Rebekah's] statements [at issue] relate to or even implicate 'domestic violence.' For instance, some of the statements at issue relate to intellectual property misuse and fraud. Further, to the extent some [of Rebekah's] statements can be interpreted to

_____

[2] We disregard the portions of Becky's declaration ruled inadmissible by the trial court judge.

7

touch on the topic of domestic violence, [Rebekah] has not met her burden of establishing that the statements further public discourse. . . . [T]he posts to the couple's 'friends' do not further public discourse.  Rather, those statements (especially in the context of other statements that do not imply violence but simply wrongdoing) do no more than paint [Chester] as an abuser and bad romantic partner."  (Italics added.)

DISCUSSION

I.

*Legal Principles*

"[T]he anti-SLAPP statute is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern."  (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 883–884 (*Wilson*).)  The anti-SLAPP statute applies to causes of action against a person that "arise[ ] from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue."  (§ 425.16.)

"A court evaluates an anti-SLAPP motion in two steps.  'Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims "arise from" protected activity in which the defendant has engaged.' "  (*Wilson, supra,* 7 Cal.5th at p. 884.)  "The defendant's first-step burden is to identify the activity each challenged claim rests on and demonstrate that that activity is protected by the anti-SLAPP statute." (*Ibid*.)  "To determine whether a claim arises from protected activity, courts must 'consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.' "  (*Ibid*.)  "Courts then must evaluate whether the defendant has

8

shown any of these actions fall within one or more of the four categories of acts protected by the anti-SLAPP statute." (*Ibid.* [cleaned up].) "At this stage, the question is only whether a defendant has made out a prima facie case that activity underlying a plaintiff's claims is statutorily protected, not whether it has shown its acts are ultimately lawful." (*Id.* at p. 888 [cleaned up].) "If the acts alleged in support of the plaintiff's claim are of the sort protected by the anti-SLAPP statute, then anti-SLAPP protections apply." (*Id.* at p. 887.)

If the defendant carries their first-step burden, the plaintiff must then demonstrate their claims have at least minimal merit. "If the plaintiff fails to meet that burden, the court will strike the claim." (*Wilson, supra*, 7 Cal.5th at p. 884 [cleaned up].) "Minimal merit" means "the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16.)

"We review de novo the grant or denial of an anti-SLAPP motion." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067 (*Park*).) "We exercise independent judgment in determining whether, based on our own review of the record, the challenged claims arise from protected activity." (*Ibid.*)

## II.

### *First-Step Analysis*

Rebekah claims her allegedly defamatory statements about domestic abuse fall within two categories of speech protected by the anti-SLAPP statute, specifically subdivisions (e)(3) and (e)(4) of section 425.16. The public forum category under subdivision (e)(3) includes "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." (*Id.*, subd. (e)(3).) The catch-all

9

category of subdivision (e)(4) includes "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

Important to our analysis, each of Chester's causes of action—for libel per se and libel per quod—are based on statements made in a series of separate internet posts. Rebekah claims that some, but not all, of the statements in the posts are protected speech. When a " 'mixed cause of action' " in a complaint combines claims concerning both unprotected activity and allegedly protected activity, we address the separate claims within the single pleaded cause of action separately; we do not consider them together. (*Baral*, *supra*, 1 Cal.5th at pp. 381, 392, 396.) Doing so, we conclude Rebekah's first two posts were protected speech under the public forum category of section 425.16, subdivision (e)(3). But she fails to establish her third post was protected speech under either provision.

A.   *The Statements in Rebekah's First Two Posts—But Not Her Third—Were Protected Speech Under the Public Forum Category*

We conclude Rebekah's first two posts are comprised of protected speech within the meaning of the anti-SLAPP statute. They were both "written or oral statement[s] or writing[s] made in a place open to the public or a public forum in connection with an issue of public interest." (§ 425.16, subd. (e)(3).)

Both posts were to a public forum. "Web sites accessible to the public . . . are 'public forums' for purposes of the ant-SLAPP statute." (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 41, fn. 4.) This includes public postings on both Facebook and Instagram. (*Cross v. Facebook, Inc.* (2017) 14 Cal.App.5th 190, 197 [Facebook]; *Jackson v. Mayweather* (2017)

10

10 Cal.App.5th 1240 [Instagram].) Rebekah's declaration and attached exhibit demonstrate her first post, to Facebook on December 11, 2021, was made using the setting that allowed access by members of the public. And, although Rebekah's declaration fails to provide similar information about her second post, made on or about December 27, it is self-evident from a copy of the post attached to the complaint that her Instagram biography was visible to users who were not following her, i.e., to members of the public.

Both posts were also plainly made "in connection with an issue of public interest" within the meaning of the anti-SLAPP statute. (§ 425.16, subd. (e)(3).) There are generally three categories of activity that constitute a public issue for purposes of section 425.16, subdivision (e)(3): (1) statements that "concern[ ] a person or entity in the public eye"; (2) conduct that "could directly affect a large number of people beyond the direct participants"; and (3) "a topic of widespread, public interest." (*Rivero v. American Federation of State, County, and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924.) Domestic violence indisputably falls into the third category as "an extremely important public issue in our society." (*Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 238 (*Sipple*).)

Here, Rebekah's first post stated, "If you or someone you know is experiencing relationship abuse, help is available. The National Domestic Violence Hotline provides free, confidential support 24/7/365. Text 'START' to 88788, call 1-800-799-SAFE (7233), or chat online at TheHotline.org. [¶] #domesticviolencesurvivor." The post also circulated an article about domestic violence that had been published in a nationally known magazine, as well as contact information for the National Domestic Violence Hotline. The post recommended that anyone "experiencing relationship abuse" contact the hotline. And in her second post, Rebekah publicly identified herself as a

11

domestic abuse survivor. According to her declaration, she did this "to let others know that they are not alone and to encourage them to also speak out."

The trial court erred when it considered Rebekah's three posts together as a single unit instead of considering them each separately as required by *Baral, supra,* 1 Cal.5th at pages 381, 392, 396. When considered separately, Rebekah's first two posts fall squarely within the ambit of the public forum category of protected speech. (§ 425.16, subd. (e)(3).) The trial court should have proceeded to the second step of the anti-SLAPP analysis with respect to these two posts.

By contrast, Rebekah published the third, "Lessons I learned" post to *private* groups consisting of her friends on Facebook and her followers on Instagram. She contends, nevertheless, the post was to a public forum within the meaning of section 425.16, subdivision (e)(3). According to Rebekah, the two groups were "comprised of a much larger audience than just people who knew Chester and Rebekah as a couple."

The problem with Rebekah's contention is that she has failed to adduce evidence to support it. We can envision many situations in which a post using the private settings on Facebook or Instagram might qualify as a post to a public forum within the meaning of section 425.16, subdivision (e)(3). As two examples, a post to a private account might qualify if the owner of the account has an exceptionally large number of friends or followers, like some celebrities do. And a post might qualify if the owner has a small following, but one comprised mainly of experts or activists who regularly discuss plans to resolve a specific matter of public interest. But we are unable to consider these possibilities—or any others—here. This is because Rebekah did not discuss her friends and followers in the declaration she submitted in support

12

of her motion. She did not discuss who they were, how many there were, whether they regularly discussed the topic of domestic abuse, or any specific details about the members of the Facebook and Instagram groups at all. Consequently, she has not met her prima facie burden to establish her third, private post to her friends and followers was to a public forum for purposes of the anti-SLAPP statute. (*Wilson, supra,* 7 Cal.5th at p. 888.)

B.     *The Statements About Domestic Abuse in Rebekah's Third Post Did Not Qualify as Protected Speech Under the Catch-all Category*

Rebekah contends in the alternative her "Lessons I learned" post is within the scope of the catchall category of section 425.16, subdivision (e)(4). As noted, the catchall category extends anti-SLAPP protection to "any other conduct in furtherance of the exercise of the constitutional right . . . of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) In *FilmOn, supra,* 7 Cal.5th 133, 149, our high court explained that the "public interest" inquiry of this prong of the statute "calls for a two-part analysis rooted in the statute's purpose and internal logic."

First, a court must ask what issue of public interest is implicated by the speech in question. (*FilmOn, supra,* 7 Cal.5th at pp. 149–150.) The first step "calls for an objective inquiry, without deference to the movant's framing or personal motivations." (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1254 (*Geiser*) ["A court evaluating an anti-SLAPP motion should take the position of a reasonable, objective observer"].) "[T]he movant's beliefs, motivations, or characterizations may be relevant, and if objectively reasonable, will inform the analysis. But they are not themselves dispositive and, if not objectively reasonable, will not carry weight." (*Ibid.*)

Second, the court must "ask what functional relationship exists between the speech and the public conversation about some matter of public

13

interest." (*FilmOn, supra,* 7 Cal.5th at pp. 149–150.)  Importantly, " 'it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate.' " (*Id.* at p. 150.)

For both steps of the analysis, courts consider both the content and context of the statements.  (*Geiser, supra,* 13 Cal.5th at p. 1252 [first step]; *FilmOn, supra,* 7 Cal.5th 149, 152 [second step].)  Context requires considerations of audience, speaker, location, purpose, and timing.  (*Geiser,* at pp. 1252–1253.)  Significantly, in making this assessment, it is often the case that many of the same contextual considerations apply to both the question of whether a statement implicates public issues as well as the question of whether a statement furthered public discussion of them.  (*Id.* at p. 1256.)  In such situations, "it may be more efficient to look to the whole context from which the conduct underlying the lawsuit arises, rather than attempting to parse which considerations fall under which of *FilmOn*'s two steps."  (*Ibid.*)  This is the approach we take here.

While a very close case, we conclude the trial court did not err in finding Rebekah's third post failed to qualify as protected speech in the catchall category.  We determine that Rebekah satisfied her first-step burden of demonstrating that her statements about domestic abuse reasonably implicate a question of public interest.  She fails, however, at the second step of showing that her post furthered the public discourse on the topic of domestic abuse.

We start with content.  We read Rebekah's third post to unambiguously address a personal experience in 2020 overcoming a relationship with a specific person she describes as a "predator[ ]."  The 10 lessons she lists describe that person, albeit by inference, as having failed to credit her for

14

intellectual property she created, having used false pretenses to deprive her of contributions to her retirement fund, being addicted "to attention, fame, their phone," and walking away from the relationship and refusing to change. The post also asserts, by clear implication, that this person abused Rebekah emotionally, psychologically, and financially. The post includes two allegedly protected statements concerning generic characteristics of relationships involving domestic abuse. These statements distill to two general points. First, domestic abuse is not limited to physical abuse; it can be "emotional, psychological, [or] financial." Second, people are uncomfortable when confronted with evidence of domestic abuse by someone they know.

Turning to context—purpose, speaker, location, audience, and timing—Rebekah submitted an exceptionally sparse declaration to support her motion. In terms of Rebekah's identity as the speaker/author of the third post, the declaration describes her as a person who "ha[s] suffered domestic abuse in previous relationships other than with [Chester]." The declaration also makes two assertions about the purpose behind her third post. First, she claims, "[t]he statements regarding domestic abuse in the February 24, 2023 posts do not mention, reference, or otherwise concern [Chester]." Second, she claims, "[t]he lessons were presented in the post in the form of motivational statements written by me." We infer the "motivational" purpose of the third post to be the same as her asserted purpose for the second post, to "let others know that they are not alone and to encourage them to also speak out."

On the other hand, in terms of location, we can see from the parties' exhibits that Rebekah chose to privately post the "Lessons I learned" statements, making it available to the newsfeeds of her friends and followers only. This limitation stands in direct contrast to her decision to make the first two posts visible to the public and available to all Facebook and

15

Instagram users. We also find the timing to be significant. The first two public posts were made in December 2021. But the "Lessons I learned" post was privately posted on February 24, 2023, more than 14 months later. The timing of the third post tends to show it was unconnected to the public discussion in the two December 2021 posts. And Rebekah provided no evidence that she participated in public discussion about domestic abuse at any other time in between.

As for the audience, we know virtually nothing about Rebekah's friends and followers. She did not provide any details about them at all. We further observe that none of the comments made by Rebekah's friends and followers in response to the third post engaged in debate about domestic abuse. Instead, one commentor wrote: "Cream always rises to the top my friend. So much to learn from these hard life lessons, for sure. Love you and miss you." Another commented, "So good." And another, "Love the pic … Hope all is good for you."

With this context in mind, we conclude Rebekah has satisfied the first step of the catch-all provision analysis. She has met the "threshold" burden of demonstrating the statements about domestic abuse in the third post reasonably implicate a question of public interest. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) It is true the third post addresses a failed relationship of no interest to the general public. But "challenged speech or conduct, considered in light of its context, may reasonably be understood to implicate a public issue, even if it also implicates a private dispute." (*Geiser, supra,* 13 Cal.5th at p. 1253.) Here, the third post can *also* reasonably be understood—through its "motivational," "lessons learned" style—to be a commentary on the value to survivors of identifying

themselves and speaking out about domestic abuse, an issue that is indisputably a matter of public interest. (*Sipple, supra,* 71 Cal.App.4th at p. 238.) "[T]hose who speak on public issues are often driven to do so by circumstances that affect them personally." (*Geiser,* at p. 1254.) "Only when an expressive activity, viewed in context, cannot reasonably be understood as implicating a public issue does an anti-SLAPP motion fail at *FilmOn*'s first step." (*Id.* at pp. 1253–1254.)

Turning to the second step, however, we conclude the evidence is insufficient to demonstrate a "functional relationship" between Rebekah's personal experience with the domestic abuse she discusses in her third post and a specific "public conversation." (*FilmOn, supra,* 7 Cal.5th at pp. 149–150.) Rebekah's remarkably limited declaration and the inferences that can be drawn from the post itself fall short of demonstrating the required link between the third post and public debate. As our high court has repeatedly explained, defendants who invoke the catchall provision are "virtually always" able to satisfy the first step of the analysis and "succeed in drawing a line—however tenuous—connecting their speech to an *abstract* issue of public interest," as Rebekah has done here. (*FilmOn, supra,* 7 Cal.5th at p. 150, italics added; accord *Geiser, supra,* 13 Cal.5th at p. 1250.) But a connection to public debate about an issue *in the abstract* is not enough to succeed at the second step. "The fact that a broad and amorphous public interest can be connected to a specific dispute is not enough." (*FilmOn,* at p. 150 [cleaned up].)

It is not enough that Rebekah's private post venting to her friends and followers about a specific failed relationship was also intended—in a general sense—to be motivational to abuse survivors. Nor is it enough that it contained two generic references to common aspects of domestic abuse.

17

Without more evidence about the reason Rebekah chose to post to a private instead of public audience and the composition of that audience, speculation is required to conclude the third post contributed to public debate. "[A] court must consider whether a statement—including the identity of its speaker, for example, or the audience sought—contributes to or furthers the public conversation on an issue of public interest. It is by carefully observing this [interplay] of content and context that we can discern if conduct is 'in furtherance of' free speech 'in connection with' a public issue or issue of public interest." (*FilmOn, supra,* 7 Cal.5th at p 154, quoting § 425.16, subd. (e)(4).) Rebekah had the burden to establish a *concrete* connection between the third post and public debate, and she failed to do so.

For the first time on appeal, Rebekah contends there is a connection between the statements in her posts and public debate because she made them as a nurse to educate her followers. Her opening brief states that her experience of being "domestically abused by a former romantic partner" had a "profound effect on [her] and caused her to pay specific attention to symptoms and signs of domestic abuse she observed in other situations, whether involving people she knew personally, professionally as a registered nurse, or in public situations, i.e., involving celebrities. As a result of the abuse she personally suffered, Rebekah knows it is difficult for a victim to, first of all, recognize that she is a victim of domestic abuse, due to the deep personal ties victims have to their abusers, and second, to stand up and speak out about it and seek help. And both personally and as a registered nurse, Rebekah understands failing to recognize relationship abuse is seriously damaging to one's own personal health, mentally, physically, and emotionally; and it is essential for victims to find support to escape that cycle of abuse." Her reply brief states she "has seen situations of domestic abuse in her professional

18

practice as a nurse." Her reply brief further asserts that her posts, including the third post, were made "as a nurse educating her followers." (Boldface omitted.)

We have no issues with the substance of Rebekah's arguments. The difficulty we have is that *there are no citations to the record for these statements*. Rebekah's declaration in support of her motion says nothing about observing domestic abuse in her practice as a nurse or seeking to educate her followers as a nurse. These statements in Rebekah's appellate briefs are not evidence and our analysis cannot consider them.

Finally, also for the first time on appeal, Rebekah claims her intent to add to the public conversation with her third post is "evidenced by her inclusion of the hashtags '#whatsyourstory,' '#nurselife,' and '#survivor' " at the end of her third post. She omits to mention the "Lessons I learned" post also includes the hashtag "#realestateinvestor." Nevertheless, Rebekah did not make this argument in the trial court. And here she fails to discuss the use of hashtags in enough detail for us to meaningfully consider whether their use can connect a private post to a public debate in a manner that satisfies the requirements of section 425.16, subdivision (e)(4). We are compelled to deem Rebekah's newfound contention as forfeited, inadequately briefed, and lacking evidentiary support. (*Industrial Waste & Debris Box Service, Inc. v. Murphy* (2016) 4 Cal.App.5th 1135, 1150 [failure to raise anti-SLAPP issue in trial court forfeited the issue on appeal]; *Noble v. Draper* (2008) 160 Cal.App.4th 1, 7, fn. 2 ["We disregard points not adequately briefed"]; *Park, supra,* 2 Cal.5th at p. 1061 ["the moving defendant bears the burden of establishing that the challenged allegations or claims 'aris[e] from' protected activity"].) Rebekah's declaration does not discuss her use of these hashtags. It does not explain how it would have been possible for members of

19

the public to see the *privately* posted "Lessons I learned" post through her use of these hashtags. And it does not explain what content concerning domestic abuse her friends and followers would have seen if they chose to conduct a search using these particular hashtags.[3] Rebekah's assertions made for the first time on appeal are not ones we can consider absent adequate briefing and evidentiary support below.

We thus conclude that Rebekah failed to carry her burden of demonstrating the third post qualified for anti-SLAPP protection under the catchall provision. This is not because a person's statements discussing a personal experience involving domestic abuse can never qualify for anti-SLAPP protection. It is instead because, based on the scanty evidence supporting Rebekah's motion, the particular statements she made to private groups of friends and followers were "too remotely connected to the public conversation about those issues, to merit protection under the catchall provision." (*FilmOn, supra,* 7 Cal.5th at p. 140.) As explained by our Supreme Court, "[a]t a sufficiently high level of generalization, any conduct can appear rationally related to a broader issue of public importance. What a court scrutinizing the nature of speech in the anti-SLAPP context must focus on is the speech at hand, rather than the prospects that such speech may conceivably have indirect consequences for an issue of public concern." (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th at pp. 610, 625.) We do not proceed, as a consequence, to the second step of the analysis with respect to Rebekah's third post.

_____

3 Notably, the third post did *not* include a hashtag that is indisputably dedicated on its face to collecting and hosting public discussion about domestic abuse, like the one she used for her first public post, "#domesticviolencesurvivor."

20

## III.

### *Second-Step Analysis on Rebekah's Two December 2021 Posts*

Rebekah contends Chester's defamation claims with respect to her first two posts about domestic abuse are barred by the statute of limitations. We agree. We exercise our discretion to address this issue despite the trial court's failure to reach it. (*Muddy Waters, LLC v. Superior Court* (2021) 62 Cal.App.5th 905, 922 ["Because our review is de novo, both parties have fully briefed the issue, and neither party contends the record is incomplete such that the issue cannot be fully considered in this appeal, we choose to consider the merits of whether plaintiff has established a probability of prevailing on its claims"].)

The statute of limitations for defamation claims is one year from the date of publication. (§ 340, subd. (c).) Rebekah's first two posts were made in December 2021. Chester's complaint was filed more than two years later, on April 28, 2023, over a year after the deadline. Chester admits he learned about the first two posts "in or around December 27, 2021." Chester's claim that Rebekah's first two statements were defamatory is accordingly time-barred. On remand, the trial court shall strike the allegations based on the protected activity of Rebekah's first two posts supporting Chester's claims. (*Baral, supra,* 1 Cal.5th at p. 396.)

## IV.

### *Attorney Fees and Costs*

Both parties claim entitlement to attorney fees and costs pursuant to section 425.16, subdivision (c). However, both parties erroneously assume that neither of them will partially prevail. The analysis of whether a party is entitled to a partial award of attorney fees is fact intensive and, here, it has not yet been briefed. (See *Mann v. Quality Old Time Service, Inc.* (2006)

139 Cal.App.4th 328, 338–340, disapproved on other grounds in *Baral v. Schnitt* (2016) 1 Cal.5th 376, 385.)  We therefore direct the trial court to decide whether to order attorney fees on a pro-rated basis to Rebekah, after an opportunity for both parties to brief the issue, and if so, to determine the appropriate amount.

## DISPOSITION

The order denying the motion to strike is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.  Upon appropriate motion by Rebekah, the trial court is directed to determine whether she is entitled to attorney fees and costs in connection with her SLAPP motion and on appeal, and if so, the appropriate amount. (Cal. Rules of Court, rule 8.278(a)(3).)


DO, J.

WE CONCUR:


DATO, Acting P. J.


KELETY, J.

22