Filed 5/7/26  Boutique Air v. Mondor CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| BOUTIQUE AIR, INC., <br><br>     Plaintiff and Appellant, <br><br> v. <br><br> COLLEEN MONDOR, <br><br>     Defendant and Respondent. | A172026 <br><br> (San Francisco City & County Super. Ct. No. CGC-23-609388) |
| BOUTIQUE AIR, INC., <br><br>     Plaintiff and Appellant, <br><br> v. <br><br> AIN MEDIA GROUP, INC., <br><br>     Defendant and Respondent. | A172027 <br><br> (San Francisco City & County Super. Ct. No. CGC-23-609388) |

After defendant Colleen Mondor wrote—and defendant AIN Media Group, Inc. published—an article about plaintiff Boutique Air, Inc., Boutique sued, claiming the article was defamatory.  Mondor and AIN filed special motions to strike under the anti-SLAPP statute (Code of Civ. Proc.,

1

§ 425.16.),[1] which the trial court granted.  Boutique maintains the court erred in several respects.  We affirm.

## BACKGROUND

### *The Parties and Their Relationships*

#### *Boutique Air*

Boutique Air operates commercial passenger flights to airports located in rural areas and/or with low-volume passenger travel in the 48 contiguous states.  It also operates charter flights.

In conducting its business, Boutique enters into contracts with the United States Department of Transportation under the federal Essential Air Services program to provide air service to the local airports.[2]  The Department issues requests for proposals for providing air service to a given airport, and airlines, such as Boutique, put in bids to provide the required service.

In the 2020 to 2022 timeframe here at issue, Boutique operated using almost entirely a single aircraft type–the Pilatus PC-12 passenger propeller

---

[1]  All statutory references are to the Code of Civil Procedure unless otherwise specified.  All undesignated references to a subdivision refer to the subdivisions of section 425.16.

[2]  Before airline deregulation in 1978, the government required air carriers to schedule and provide at least two daily round trips at each point on their certificates.  Deregulation raised the concern that communities with relatively lower traffic levels would lose service entirely as carriers shifted their operations to larger, potentially more lucrative markets.  To address this problem, Congress added section 419 to the Federal Aviation Act, which established the Essential Air Services program to ensure that smaller communities would retain a link to the National Air Transportation System, with federal subsidy when necessary.  The program has been permanently authorized by Congress.  (https://www.transportation.gov/policy/aviation-policy/small-community-rural-air-service/essential-air-service [as of May 7, 2026].)

2

driven plane. The PC-12 aircraft can be flown with one or two pilots. Although Federal Aviation Administration (FAA) regulations permitted the PC-12 to be operated with just one pilot, Boutique utilized a captain and a first officer (the Second in Command or SIC) to fly the PC-12, believing this was safer, especially when navigating large, heavily trafficked airports. Having two pilots also provided an opportunity for the less experienced Seconds in Command to log flight hours, advance their experience and skills, and eventually become captains.

In 2018, the FAA indicated its intention to require a new Second in Command Pilot Development Program that would give the FAA greater ability to monitor Second in Command pilot training and certified flight hours at commercial operators they oversee. It subsequently adopted regulations for Part 135 commercial operators using a Second in Command on a PC-12, which permitted a Second in Command to log flight hours if the plane was flown without using autopilot. However, a PC-12 could not be flown with a Second in Command logging hours with autopilot engaged unless the airline had an approved Pilot Development Program.

In June 2021, the FAA notified Boutique it needed to file a Pilot Development Plan. In October, an FAA inspector sent a letter to Boutique stating it was out of compliance with regulations because it was using Seconds in Command on PC-12 flights but did not have an approved Pilot Development Plan. The letter further stated: " 'Flight time accumulated during any flight by Boutique Air, Inc. [Seconds in Command] shall not be counted for either total time or flight time leading to further FAA certifications until a [Second in Command Pilot Development] Program is approved.' " The FAA subsequently clarified PC-12 flights could be operated with a Second in Command on board pending approval of the Boutique Pilot

3

Development Plan, but, if a Second in Command was on board, the autopilot could not be used, and autopilot time could not be counted toward the Second in Command's flight hours.

Boutique submitted its proposed Pilot Development Plan to the FAA in November, and it was approved the following March. According to Boutique, after the plan's approval, the FAA told the company it would be reviewing individual pilot flying hours for accreditation to see if those hours were logged on flights that had used autopilot.

### Colleen Mondor and AIN

Mondor is a freelance aviation journalist with 36 years of professional aviation experience. She is a licensed pilot and has worked for a flight school and two airlines, one of which involved Part 135 commuter operations like Boutique. Mondor holds degrees in Aviation Management (B.S.); History, with emphasis on air transportation (B.A.); and Northern Studies (M.A.), which included a published thesis investigating Part 135 accidents in Alaska. She has written extensively on aviation for various outlets including *Aviation International News, Skies Magazine, Aviation Safety Magazine, Mens Journal, The Midnight Sun, The Anchorage Daily News,* and *Plane & Pilot.* Her memoir, *The Map of My Dead Pilots*—based on her work in Alaska for a Fairbanks-based bush commuter—was selected as an Editor's Choice by *Booklist.*

In April 2022, while researching a possible article on Boutique, Mondor made a request under the Freedom of Information Act for "copies of e-mails and correspondence between the [FAA] and Boutique Air concerning first officer training and the Pilot Development Program written between 2018 and 2022." Her request was denied the next month "[d]ue to an ongoing agency investigation on training and the Pilot Development Program at

4

Boutique." According to the FAA, "[p]ublic release of these records could impede or compromise this investigation."

AIN is the publisher of an airline industry trade publication called Aviation International News, which is published in both print and online formats.

In September, Mondor's article—"SIC Logging Is Focus of FAA Investigation into Boutique Air"—was posted to the AIN news Web site. Following the headline, a sub headline states: "The FAA has questioned Boutique Air's training and pilot development program, but a probe has expanded into other areas."

*The Article*

Mondor's article begins by explaining that Boutique, a Part 135 commuter airline and active participant in the Essential Air Service market, "is in the midst of an FAA investigation into its training and pilot development program." In this regard, the article quotes a late 2021 letter from Boutique CEO Shawn Simpson addressed to the " 'United States FAA,' " which was posted "in numerous online venues." In the letter, Simpson referenced an October notification from the Fargo Flight Standards District Office informing Boutique that " '100 percent of our First Officers should no longer be flying in our aircraft because their position as Second in Command [SIC], is not valid and therefore we must stop immediately using these pilots in this role.' " He further stated district office staff had informed him " ' "none" of the time that our First Officers have accumulated at the company will count as real flight time.' " Although the FAA refused to comment on the "ongoing" investigation and multiple efforts to interview Boutique had been unsuccessful, Mondor cited federal records disclosing that Boutique's Pilot Development Program had been approved in March 2022.

5

Mondor explained that co-pilots are permitted to log time for aircraft operating per Part 135 that do not require second pilots by type certification, but only if the company possesses an approved Pilot Development Program. "Based on the ongoing investigation, it appears that Boutique did not have the requisite approvals." She wrote that the FAA began tracking exchanges with Boutique Seconds in Command in December 2021, "noting repeated requests for information about the status of the [Pilot Development Program], the implications of logging SIC time for Boutique, and anxiety surrounding the future. These concerns echoed broader discussions occurring in online pilot forums where members asked for guidance on how to determine if their logged time was valid and, for those no longer employed with Boutique, how to broach the topic with new employers."

The article then segues into a discussion of safety issues experienced by the company, using the following transition: "It should be noted that the FAA's ongoing investigation into Boutique addresses not only the [Pilot Development Program] but also company training in general. *This could include issues beyond the program itself*, and records show that the FAA has received reports from [Air Traffic Control] over the past couple of years of several runway incursions and deviations from assigned altitude for Boutique pilots." (Italics added.) Mondor then cites several incidents gleaned from federal records.

Next, Mondor takes a broader look at Boutique, noting that, to "form a complete picture" of the company, she obtained hundreds of pages of documents from the FAA under the Freedom of Information Act and combed through agency data from the Department of Transportation, the Bureau of Transportation Statistics, and the Department of Treasury. "The results provided a study of an airline that spent the past decade pursuing a strong

position among [Essential Air Service] carriers but now, despite substantial funding via the Covid Payroll Support Program, faces a significant downturn in passenger numbers and recurring issues with training and maintenance."

With respect to Boutique's downturn in business, Mondor stated the Essential Air Service market is notoriously "volatile," with airlines entering and exiting segments of the market strictly for economic reasons. It can also be lucrative: A June 2022 report from the Department of Transportation observed that Essential Air Service contracts for the United States (including Puerto Rico) totaled $368,974,326, with 171 communities receiving the subsidized service. Mondor described Boutique as initially a "tenacious contender" for contracts, and, by February 2019, it was operating 17 Essential Air Services routes and fulfilling contracts valued at $49.9 million. However, in correspondence with the FAA late that year, Boutique's then-director of operations wrote that " 'cancellations and delays are at an all-time high and if we continue like this we will [lose] our codeshare partners and possibly some of our routes.' " The company subsequently failed to be reselected for a succession of Essential Air Service airports. It also voluntarily terminated certain other contracts. As of a June 2022 report from the Department of Transportation, Boutique was flying only five Essential Air Service routes, valued at $17.3 million.

With respect to other operational issues, the article describes a litany of events based on records Mondor obtained through Freedom of Information Act requests. According to those records, "[c]ancellations and delays were widespread in the company's route structure, and between 2018 and 2022 Boutique experienced more than 150 gate returns, air returns, diversions, aborted takeoffs, FAA-designated incidents, and events. In the same period, there were 30 in-flight emergency declarations for reasons ranging from

7

faulty landing gear indications to electrical failures to loss of engine power."
Mondor wrote that the "most harrowing event to date for Boutique
passengers likely occurred in May 2021, right before takeoff from
Minneapolis to Ironwood, Michigan, when an emergency door came off.
Following that event, concerns were raised by the local airport authority,
prompting [Boutique's CEO] to attend an airport board meeting."  In
addition, "both pilots on the aircraft were fired for, according to the company,
failing to complete a pre-flight checklist."  Boutique, itself, subsequently
terminated the Minneapolis contract.

### *Boutique's Complaint*

Boutique filed its second amended complaint, the operative complaint
in this matter, in June 2024.  The complaint alleges that Mondor's article
characterized Boutique's "operations as being plagued by safety concerns and
operational problems that were causing the airline to lose routes making it
likely that [it] would go out of business."  Specifically, Boutique alleged that
the article: (1) falsely stated the company "continued to be investigated by the
FAA for safety violations"; (2) mischaracterized its use of two pilots on its
flights "as a safety concern, rather than a safety enhancement"; (3) recited
service issues the company had experienced without explaining industry
norms, "leaving the reader with the [untrue] impression that [its] operations
posed a significantly greater safety risk than its competitors"; and (4) falsely
stated that a safety incident on a flight to Ironwood, Michigan was the reason
four other regional airports cancelled their contracts with the company.

In addition, the complaint cites the following statements from the
article as libelous on their face:

- " 'It should be noted that the FAA's ongoing investigation into Boutique
  addresses not only the [Second in Command Pilot Development

8

Program] but also company training in general. This could include issues beyond the program itself, and records show that the FAA has received reports from [Air Traffic Control] over the past couple of years of several runway incursions and deviations from assigned altitude for Boutique pilots.' " Boutique claims there was no ongoing FAA investigation into its "training in general" or " 'issues beyond the program itself.' "

- " 'Boutique was selected for its first [Essential Air Services] route in April 2014, joining companies like Great Lakes Airways, Pacific Wings, Sea Port Airlines, and Pen Air, all of which are no longer in business.' " Boutique claims this statement falsely implied it was "destined to go out of business like the other carriers named."

- " 'Cancellations and delays were widespread in the company's route structure, and between 2018 and 2022 Boutique experienced more than 150 gate returns, air returns, diversions, aborted takeoffs, FAA-designated incidents, and events. In the same period, there were 30 in-flight emergency declarations for reasons ranging from faulty landing gear indications to electrical failures to loss of engine power.' " Boutique claims this falsely suggested its incident record was excessive when compared with industry norms.

- " 'While the predominant aircraft in Boutique's fleet, the Pilatus PC-12, is authorized for single pilot operations, Boutique has largely flown it with a dual crew. According to [regulation], co-pilots are permitted to log time for aircraft operating Part 135 that do not require second pilots by type certification but only if the company possesses an approved [Pilot Development Program] in its operations specifications. Based on the ongoing investigation, it appears that Boutique did not have the

9

requisite approvals.' " Boutique acknowledges this statement is "facially true," but claims it "was false and misleading" because it "suggested" the company's use of a Second in Command in the absence of an approved Pilot Development Program was unsafe, while, in fact, the practice provided enhanced safety for Boutique's passengers and crew.

- " 'The company forecasted difficulties however in correspondence with the FAA late that year. Boutique's then-director of operations . . . wrote that "cancellations and delays are at an all-time high and if we continue like this we will [lose] our codeshare partners and possibly some of our routes." The pressure on the company was obvious at that point as it failed to be re-selected for a succession of [Essential Air Services] airports.' " Boutique claims this statement "created the false impression" that its failure to be reselected by these airports was due to its "safety and performance record when it was not due to any performance issues with [Boutique]."

Based on these allegations, the complaint sets forth four causes of action against Mondor and AIN—two causes of action for libel per se and per quod; a cause of action for trade libel; and a cause of action for misappropriation of trade secrets.[3] The complaint further alleges the article "was widely distributed in print and electronic form to municipalities, airport authorities, and those in the air charter business." Boutique claims that as a direct and proximate result of "the false and defamatory statements" in the article, several municipalities or local authorities whose airports Boutique

---

[3] The complaint also sets forth two causes of action against a former employee which are not at issue in this appeal.

10

served declined to renew their contracts.  It further claims it suffered a significant decline in its charter business.

***The Motions to Strike***

In August 2024, AIN filed a special motion to strike under section 425.16 as to all four causes of action asserted against it.  AIN argued the article qualifies as protected activity under various subdivisions of the anti-SLAPP statute, including subdivision (e)(4), which protects "any other conduct in furtherance of the exercise of the constitutional right . . . of free speech in connection with a public issue or an issue of public interest."  It further asserted Boutique could not demonstrate a probability it would prevail on any of its claims (see § 425.16, subd. (b)(1)) because the statements in the article are neither false nor malicious, and they are absolutely privileged in any case under Civil Code section 47, subdivision (d)(1) as " 'a fair and true report in . . . a public journal, of [a] public official proceeding, . . . or . . . anything said in the course thereof.' "  In support of its motion, AIN supplied a declaration from Mondor, stating she obtained all her source material for the article from publicly available sources and disagreeing that the statements challenged by Boutique are untrue.

The following month, Mondor filed her own special motion to strike all causes of action asserted against her.  She focused on the public safety aspects of the article, arguing it falls within the purview of section 425.16, subdivision (e)(3)—which protects statements made in a "public forum in connection with an issue of public interest"—as well as within the purview of subdivision (e)(4).  Mondor also argued Boutique could not demonstrate a probability of prevailing on its claims because the statements in the article are absolutely privileged under Civil Code section 47, subdivision (d), as fair and true reports of official governmental proceedings, were statements of

11

opinion, and/or were substantially true. In support of her motion, Mondor supplied another declaration, explaining her drafting process, responding to Boutique's claims, and attaching hundreds of pages of the documents she relied on when writing the article.

### The Trial Court's Ruling

The trial court heard the motions together and granted both. The court first ruled the challenged statements qualify as protected activity under the anti-SLAPP statutes because they concerned an issue of public interest, namely airline safety. It further ruled Boutique failed to demonstrate a probability of prevailing on its claims. One, because the statements about the FAA's investigation and actions were absolutely privileged; and two, because the company failed to show the remainder of the challenged statements were false.[4]

## DISCUSSION

### Anti-SLAPP Statutes and Standards of Review[5]

A SLAPP (Strategic Lawsuit Against Public Participation) " 'is a civil lawsuit that is aimed at preventing citizens from exercising their political rights or punishing those who have done so.' " (*Michael K. v. Cho* (2025) 113 Cal.App.5th 1, 7.) In response to the rise in SLAPPs, the Legislature enacted the anti-SLAPP statute (§ 425.16) in 1992, "to prevent and deter 'lawsuits . . . brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'

---

[4] The court also denied Boutique's related motion for further discovery because it had failed to show good cause. Boutique does not challenge that ruling on appeal.

[5] On December 15, 2025, we granted Boutique's motion to consolidate the two cases (Nos. A172026 & A172027) for oral argument. On our own motion, we also ordered the cases consolidated for purposes of decision.

[Citation.] Because these meritless lawsuits seek to deplete 'the defendant's energy' and drain 'his or her resources' [citation], the Legislature sought ' "to prevent SLAPPs by ending them early and without great cost to the SLAPP target." ' [Citation.] Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192; see *Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 619 (*Rand*).)

When it adopted the anti-SLAPP statute, the Legislature declared that "it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process." (§ 425.16, subd. (a).) In 1997, the Legislature amended the statute to provide that, in support of its purpose, the statute " 'shall be construed broadly.' " (*Rand*, *supra*, 6 Cal.5th at p. 619, quoting § 425.16, subd. (a).)

"The procedure made available to defendants by the anti-SLAPP statute has a distinctive two-part structure. [Citations.] A court may strike a cause of action only if the cause of action (1) arises from an act in furtherance of the right of petition or free speech 'in connection with a public issue,' and (2) the plaintiff has not established 'a probability' of prevailing on the claim." (*Rand*, *supra*, 6 Cal.5th at pp. 619–620; see § 425.16, subd. (b)(1) ["A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."].)

13

"A defendant satisfies the first step of the analysis by demonstrating that the 'conduct by which plaintiff claims to have been injured falls within one of the four categories described in subdivision (e) [of section 425.16]' [citation], and that the plaintiff's claims in fact *arise* from that conduct [citation]. The four categories in subdivision (e) describe conduct ' "in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue." ' " (*Rand*, *supra*, 6 Cal.5th at p. 620.) Second, if the defendant has met its threshold burden, "the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success. . . . . The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*); see *Sandoval v. Pali Institute, Inc.* (2025) 113 Cal.App.5th 616, 633 [plaintiff must submit competent, admissible evidence].)

" 'Review of an order granting or denying a motion to strike under section 425.16 is de novo. [Citation.] We consider "the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) However, we neither "weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." ' " (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325–326.)

***Prong One Analysis***

14

As we have recited, subdivision (e)(3) protects "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." Subdivision (e)(4) protects "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." Thus, there is obvious overlap between the two subdivisions. As we shall explain, we conclude the challenged statements are protected speech under subdivision (e)(4), and we therefore need not, and do not, discuss subdivision (e)(3).

### *Analytical Framework*

Our Supreme Court set forth the appropriate analytical framework for analyzing a claim for anti-SLAPP protection under subdivision (e)(4) in *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133 (*FilmOn*). Specifically, the court concluded that, "within the framework of section 425.16, subdivision (e)(4), a court must consider *the context* as well as *the content* of a statement in determining whether that statement furthers the exercise of constitutional speech rights in connection with a matter of public interest." (*Id.* at p. 149, italics added.) Thus, "[f]irst, we ask what 'public issue or . . . issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech. [Citation.] Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest. It is at the latter stage that context proves useful." (*Id.* at pp. 149–150; accord, *Doe v. Ledor* (2023) 97 Cal.App.5th 731, 743–744 (*Ledor*).)

"With respect to the first step, the statute does not define the terms 'public issue' or 'issue of public interest.' However, to make this determination, 'courts look to certain specific considerations, such as whether

15

the subject of the speech or activity "was a person or entity in the public eye" or "could affect large numbers of people beyond the direct participants" [citation]; and whether the activity "occur[red] in the context of an ongoing controversy, dispute or discussion" [citation], or "affect[ed] a community in a manner similar to that of a governmental entity" [citation].' " (*Ledor, supra,* 97 Cal.App.5th at p. 744, quoting *FilmOn, supra,* 7 Cal.5th at pp. 145–146; see *Cocoa AJ Holdings, LLC v. Schneider* (2025) 115 Cal.App.5th 980, 992 [noting public interest under the anti-SLAPP statute has been broadly defined to include, in addition to government matters, " ' " ' "private conduct that . . . affects a community in a manner similar to that of a governmental entity" ' " ' " such as disputes with homeowners associations].)

The high court further clarified *FilmOn*'s first step in *Geiser v. Kuhns* (2022) 13 Cal.5th 1238 (*Geiser*). "As it did in *FilmOn,* the high court cautioned that speech is rarely ' " 'about' " ' any single issue, and it reiterated its critique of cases that had attempted to discern a single topic of speech. (*Geiser, . . .* at pp. 1249–1250.) Thus, *FilmOn*'s first step is satisfied 'so long as the challenged speech or conduct, considered in light of its context, may reasonably be understood to implicate a public issue, even if it also implicates a private dispute.' (*Geiser,* at p. 1253.) *Geiser* also made clear that this first step requires 'an objective inquiry, without deference to the movant's framing or personal motivations,' although those components may inform the analysis if objectively reasonable. (*Id.* at p. 1254.) 'If a reasonable inference can be drawn that the challenged activity implicates a public issue, then the analysis proceeds to *FilmOn*'s second step.' " (*Ledor, supra,* 97 Cal.App.5th at p. 744.) Moreover, "[l]ike the SLAPP statute itself, the question whether something is an issue of public interest must be ' " 'construed broadly.' " ' "

16

(*Hecimovich v. Encinal School Parent Teacher Organization* (2012)
203 Cal.App.4th 450, 464.)

"*FilmOn*'s second step 'moves from a focus on identifying the relevant matters of public interest to addressing the specific nature of defendant's speech and its relationship to the matters of public interest.' (*FilmOn, supra*, 7 Cal.5th at p. 152.) Because 'virtually always, defendants succeed in drawing a line—however tenuous—connecting their speech to an abstract issue of public interest,' section 425.16(e)(4) 'demands "some degree of closeness" between the challenged statements and the asserted public interest.' (*FilmOn*, at p. 150.) ' "[I]t is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate." ' " (*Ledor, supra*, 97 Cal.App.5th at p. 744.)

" 'What it means to "contribute to the public debate" [citation] will perhaps differ based on the state of public discourse at a given time, and the topic of contention. But ultimately, our inquiry does not turn on a normative evaluation of the substance of the speech. We are not concerned with the social utility of the speech at issue, or the degree to which it propelled the conversation in any particular direction; rather, we examine whether a defendant—through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest.' " (*Ledor, supra*, 97 Cal.App.5th at pp. 744–745, quoting *FilmOn, supra*, 7 Cal.5th at pp. 150–151.) And at this second step, whether a defendant—through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest is an "inquiry . . . a court can hardly undertake without incorporating considerations of context—including audience, speaker, and purpose." (*FilmOn*, at pp. 151–152.)

17

### *The Challenged Speech is Protected Speech (Prong One)*

Boutique has not advanced any argument on appeal focused on the initial "public interest" step of the prong-one analysis pertinent to subdivision (e)(4). This is understandable, as the challenged statements readily clear this initial inquiry. Each of the statements pertain to the performance of a national airline, potentially affecting members of the flying public, as well as pilots, local airports, and other airlines involved in the Essential Air Services program. Moreover, the genesis of Mondor's article was an ongoing FAA investigation into Boutique's compliance with federal regulations—also unquestionably a matter of public interest. The article additionally provides a general overview of the federally subsidized Essential Air Services program and a history of one airline's participation in that program, again information of interest to the public. (See *FilmOn, supra*, 7 Cal.5th at pp. 145–146.) Thus, even if the article was also "about" the improper logging of flight hours by various individual pilots, the challenged statements additionally pertained to public issues, thereby satisfying *FilmOn*'s first step. (See *Geiser, supra*, 13 Cal.5th at pp. 1253–1254; compare *Yang v. Tenet Healthcare Inc.* (2020) 48 Cal.App.5th 939, 947 [speech involving the qualifications, competence, and professional ethics of a licensed physician implicated a public issue]; *Industrial Waste & Debris Box Service, Inc. v. Murphy* (2016) 4 Cal.App.5th 1135, 1140–1141, 1148–1149 (*Industrial Waste*) [report by private consultant hired by competitor of plaintiff waste hauler implicated public issues of limited landfill capacity and the environmental effects of waste disposal in landfills where report derived its findings from publicly available data and focused on whether waste hauling companies were meeting government standards]; *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 900 [statements

"ostensibly provided to aid consumers choosing among brokers . . . were directly connected to an issue of public concern"].)

Boutique, instead, has focused on the second step of the prong-one analysis, which requires us to determine whether the challenged statements "in some manner" contributed to the public discourse on the identified public issues. Boutique maintains they did not, and "would instead, [have been] read by the average reader as a report for airline industry insiders about an arcane bureaucratic dispute between Boutique and the FAA over whether Boutique's First Officers were logging their SIC flight times on P-12 aircraft in accordance with FAA regulations." Put another way, according to Boutique, the "context" of the article is best illustrated by its headline ("SIC Logging Is Focus of FAA Investigation into Boutique Air"). Thus, as Boutique sees it, the article discusses an FAA investigation into a generally uninteresting regulatory issue and is pitched at a narrow slice of readers such as current and former Boutique pilots, or other pilots of P-12 aircraft. It points out its "bookings were dependent upon a handful of local airport administrators and directors and airline charter booking agencies, not the general public" and maintains "[t]here is nothing in the record to support any finding that the Article was ever seen by the greater flying public."

Boutique goes on to point out Mondor did not describe herself as having any reporting history on air safety and claims the article, thus, provided no context for understanding whether Boutique's safety record was above or below industry norms. Boutique asserts the article would have needed a "far more sophisticated discussion" of airline safety to further any public discussion regarding that topic.

In short, as Boutique sees it, when viewed in context, Mondor's industry-specific article focused on Seconds in Command on PC-12 flights

19

servicing the Essential Air Service market under Part 135, and specifically focusing on a single regulatory requirement for flight-time qualification, published in a trade journal, is not the type of speech the anti-SLAPP statutes were designed to protect because it was not made "in connection with" a public issue as that requirement has been articulated for purposes of subdivision (e)(4).

We conclude otherwise.

To begin with, Boutique's constricted view of the purpose of Mondor's article disregards the Supreme Court's caution that speech is rarely about any single issue.[6] (*Geiser*, *supra*, 13 Cal.5th at pp. 1249–1250.) While we agree the article discusses the FAA investigation into Boutique's logging of Second in Command flight hours, it does so as a starting point for a deeper dive into Boutique's performance generally as an Essential Air Service provider and includes reporting on the airline's overall safety record, as well as its trajectory as a participant in the Essential Air Services market. We have no trouble concluding these statements amounted to participation in, or furtherance of, discourse on matters of public interest.

---

[6] The two cases on which Boutique relies—*Bikkina v. Mahadevan* (2015) 241 Cal.App.4th 70, 85 [finding the defendant's speech was "about falsified data and plagiarism in two scientific papers, not about global warming"] and *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 111 [concluding the defendants' statements "were not about pollution or potential public health and safety issues in general, but about [the plaintiffs'] specific business practices"]—do not assist the company. Both were decided before *FilmOn*, and the Supreme Court cited them in that case as examples of what *not* to do, finding their "focus on discerning a single topic of speech is less than satisfying." (*FilmOn*, *supra*, 7 Cal.5th at p. 149.) It then went on to articulate its two-part test in order "to steer courts away from this mode of analysis." (*Geiser*, *supra*, 13 Cal.5th at p. 1249.)

20

Boutique's limited-audience argument also disregards that the article was posted online and therefore was, and remains, available to the general public. Indeed, Boutique has conceded that AIN's news Web site is a public forum for purposes of this litigation, and caselaw supports that view. (See *Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 41, fn. 4 ["Web sites accessible to the public, like . . . 'newsgroups' . . . are 'public forums' for purposes of the anti-SLAPP statute"].) Speech that has been found to fall outside the protection of the anti-SLAPP statutes, in contrast, often has been distributed far more narrowly. (See, e.g., *FilmOn, supra*, 7 Cal.5th at p. 140 [allegedly disparaging statements made in confidential reports that the defendant disseminated to clients]; *Ledor, supra*, 97 Cal.App.5th at p. 746 [e-mails sent to school officials used for their private purposes].)

We also reject Boutique's suggestion that Mondor cannot be said to have reported on matters of airline safety of concern to the general public because she describes herself as an aviation journalist and does not highlight any reporting experience on the history of air safety. We note Mondor, in fact, has such experience (i.e., her dissertation was an investigation of Part 135 accidents in Alaska). In any case, the research evidenced in her article provides ample basis to conclude no reader would have thought Mondor did not know what she was talking about, therefore discounting her comments as irrelevant to public discourse on airline safety.

We likewise reject Boutique's assertion that the article's discussion of Boutique's safety record needed to be "far more sophisticated" to advance or contribute to the public debate regarding airline safety. The context here reflects an investigative aviation journalist writing an article for an aviation news publisher—these are exactly the types of parties that further the conversation on issues like airline safety. Moreover, Boutique's claim that

21

there must be some level of sophistication and/or conclusions drawn from stated facts to qualify for anti-SLAPP protection runs afoul of the Supreme Court's analysis in *FilmOn* that *participation* in the discourse on the public issue is sufficient for purposes of the anti-SLAPP statute. (*FilmOn*, *supra*, 7 Cal.5th at p. 151 ["[U]ltimately, our inquiry does not turn on a normative evaluation of the substance of the speech. We are not concerned with the social utility of the speech at issue, or *the degree to which* it propelled the conversation in any particular direction; rather, we examine whether a defendant—through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest." Italics added.]; see *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 269 (*Baker*) [" 'The First Amendment is served not only by articles and columns that purport to be definitive but by those articles that, more modestly, raise questions and prompt investigation or debate.' "].)

We therefore agree with the trial court that Mondor and AIN satisfied their prong-one burden under the anti-SLAPP analysis.

**Prong Two Analysis**

With Mondor and AIN having met their prong-one burden under the anti-SLAPP statute, the burden shifted to Boutique to demonstrate, under prong two, a probability of success on its claims. (See *Baral*, *supra*, 1 Cal.5th at p. 384.)

### *Analytical Framework*

When determining whether a plaintiff has demonstrated a probability of success under the anti-SLAPP statutes, we do not weigh evidence or resolve conflicting factual claims. Rather, our "inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. [We] accept[] the

22

plaintiff's evidence as true, and evaluate[] the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." (*Baral, supra,* 1 Cal.5th at p. 385.)

Boutique's complaint asserted causes of action against Mondor and AIN for libel per se and libel per quod. "Libel is the publication of an unprivileged written communication about the plaintiff that is false, defamatory, and has a natural tendency to injure. (Civ. Code, §§ 44, 45. . . .) Libel per se is when the communication is defamatory without the need for explanatory matter. (Civ. Code, § 45a.)" (*Edward v. Ellis* (2021) 72 Cal.App.5th 780, 790 (*Edward*).) Defamatory language not libelous on its face is libel per quod. "The distinction has been described as follows: 'If no reasonable reader would perceive in a false and unprivileged publication a meaning which tended to injure the subject's reputation in any of the enumerated respects, then there is no libel at all. If such a reader would perceive a defamatory meaning without extrinsic aid beyond his or her own intelligence and common sense, then (under section 45a and the cases . . . which have construed it) there is a libel per se. But if the reader would be able to recognize a defamatory meaning only by virtue of his or her knowledge of specific facts and circumstances, extrinsic to the publication, which are not matters of common knowledge rationally attributable to all reasonable persons, then (under the same authorities) the libel cannot be libel per se but will be **libel *per quod*.**'" (*Bartholomew v. YouTube, LLC* (2017) 17 Cal.App.5th 1217, 1226–1227, boldface added.)

"As a general matter, a defamation claim does not require a plaintiff to plead or prove falsity or malice. [Citations.] However, where the communication involves a matter of public concern, the plaintiff does bear the burden of pleading and proving falsity. [Citations.] Further, in trade libel

23

cases, a plaintiff seeking damages must prove that the allegedly disparaging statement is false." (*Industrial Waste, supra,* 4 Cal.App.5th at p. 1156, fn. omitted.)[7]

"In determining whether the disputed statement communicates or implies a provably false assertion of fact, we look at the totality of the circumstances, looking first to the language of the statement and whether it was understood in a defamatory sense, and then considering the context in which the statement was made. [Citation.] We focus not on the literal truth or falsity of each word in a statement, but rather on ' " 'whether the "gist or sting" of the statement is true or false, benign or defamatory, in substance.' " ' [Citations.] We also consider 'whether the reasonable or "average" reader would so interpret the material. [Citations.] The "average reader" is a reasonable member of the audience to which the material was originally addressed.' " (*Edward, supra,* 72 Cal.App.5th at pp. 790–791.) Whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court. (*Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1049 (*Nygard*).)

While opinions are generally not actionable, "expressions of opinion may imply an assertion of objective fact, and a statement that implies a false assertion of fact, even if couched as an opinion, can be actionable." (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112 (*McGarry*).) However, even when a "statement arguably could be understood as implying

---

[7] The complaint also stated a cause of action for misappropriation of trade secrets, based on allegations Mondor (and through her) AIN improperly received and used Boutique trade secrets provided by a former employee when writing and publishing the article. Mondor submitted a declaration stating she did not know and had never communicated with this individual. Boutique's showing, in turn, did not attempt to demonstrate it would probably prevail on this claim. We therefore do not consider it.

facts capable of being proved true or false, it is not actionable if it discloses all of the statements of fact on which the opinion is based and those statements are true." (*Nygard, supra*, 159 Cal.App.4th at p. 1053.) Whether a statement is a fact or opinion is a question of law for the court to decide. (*Baker, supra,* 42 Cal.3d at p. 260; see *Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1147.)

### *No Probability of Success (Prong Two)*

As we have recited, Boutique's complaint challenges a number of statements made in Mondor's article involving the FAA investigation, documented safety and operational issues, and the airline's track record with respect to participation in the federal Essential Air Services program. We conclude Boutique has not carried its burden to show a probability of success on any of the allegedly libelous statements.

To begin with, several of the challenged statements are plainly not incorrect or not libelous.

For example, Boutique's claim that the article mischaracterized its use of two pilots on its flights "as a safety concern, rather than a safety enhancement" is not borne out by the language in the article or common sense. The relevant passage of the article stated, in context, "Following the widespread release of Simpson's letter on the [Second in Command Pilot Development Program], the FAA recorded multiple contacts from Boutique co-pilots inquiring about the status *of their logged flight time*. While the predominant aircraft in Boutique's fleet, the Pilatus PC-12, is authorized for single pilot operations, Boutique has largely flown it with a dual crew. According to FAR 135.99, *co-pilots are permitted to log time* for aircraft operating Part 135 that do not require second pilots by type certification but only if the company possesses an approved [Pilot Development Program]. . . . Based on the ongoing investigation, it appears that Boutique did not have the

25

requisite approvals." (Italics added.) The paragraph immediately following the one just quoted goes on to elaborate that exchanges by Boutique Seconds in Command with the FAA, and related discussions in online pilot forums, focused on the status of the Pilot Development Program, the implications *of logging* Second in Command time for Boutique, and how to determine if *their logged time* was valid.

Nothing in the foregoing suggests flying with two pilots was less safe than flying with one pilot, and, as a matter of commonsense, no reasonable person would believe this to be true. Rather, the issue discussed was clearly whether Seconds in Command who flew for Boutique before the approval of its Pilot Development Program would be able to count those hours toward future flight certifications. Indeed, Boutique conceded this language in the article was "facially true."

Similarly, there is no basis for Boutique's claim that the article falsely stated a safety incident on a flight to Ironwood, Michigan was the reason four other regional airports cancelled their contracts with the company. Boutique does not recite the assertedly libelous language, but we presume it is drawn from the following paragraph: "The most harrowing event to date for Boutique passengers likely occurred in May 2021, right before takeoff from Minneapolis to Ironwood, Michigan, when an emergency door came off. Following that event, concerns were raised by the local airport authority, prompting Simpson to attend an airport board meeting. Soon after, *the company announced it was filing to terminate its EAS contract for Ironwood*, and both pilots on the aircraft were fired for, according to the company, failing to complete a pre-flight checklist. That same year *Boutique also terminated* a contract in Jackson, Tennessee, and in 2022 *it requested to pull*

26

*out of* Altoona, Pennsylvania; Show Low, Arizona; and Pendleton." (Italics added.)

Thus, contrary to Boutique's claim, the article unequivocally states it was Boutique, not the regional airports, that decided to end the referenced Essential Air Services contracts. In short, the article simply does not say what Boutique claims it says and does not support its claim for libel.

The same is true of Boutique's complaint about the article's summary of the Essential Air Services Program and Boutique's history within that program which stated, " 'Boutique was selected for its first [Essential Air Services] route in April 2014, joining companies like Great Lakes Airways, Pacific Wings, Sea Port Airlines, and Pen Air, all of which are no longer in business.' " Boutique maintains this statement falsely implied it was "destined to go out of business like the other carriers named." However, this ignores that the article went on to say that the Essential Air services market is "notoriously volatile," involving mergers, dissolutions, and bankruptcies, along with terminations of routes based solely on economic reasons or pilot shortages. Despite this—and although the Essential Air Services program has "a host of detractors"—the article acknowledged it has continued to grow due to "the promise of millions of dollars in guaranteed route income." The article further stated, "Boutique proved itself a tenacious contender for contracts from the beginning."

Thus, read in context, the challenged statement regarding other Essential Air Services airlines going out of business spoke to the general volatility of the market, not the destiny of any particular airline, including Boutique. In short, the article did not declare that Boutique, specifically, was "destined to fail" to any greater extent than any other participant in this

27

uncertain market. And no reasonable person would consider this a libelous statement.

Boutique also overstates the supposed import of the following statement in the article: " 'The company forecasted difficulties however in correspondence with the FAA late [in 2019]. Boutique's then-director of operations . . . wrote that "cancellations and delays are at an all-time high and if we continue like this we will [lose] our codeshare partners [other airlines who sell seats on Boutique flights under their name] and possibly some of our routes." The pressure on the company was obvious at that point as it failed to be re-selected for a succession of [Essential Air Services] airports.' " Boutique claims this statement "created the false impression" that its failure to be reselected by these airports was due to its "safety and performance record when it was not due to any performance issues with [Boutique]."

To the contrary, the statement simply repeats Boutique's own statement it was experiencing " 'all-time high' " cancellations and delays in that timeframe. These problems could have been caused by any number of issues—such as lack of pilots, insufficient passengers, or airport conditions causing delays. Moreover, Simpson's declaration suggested the company lost the routes because the airports chose companies who used jets. (That Mondor takes issue with this assertion is beside the point for purposes of the issue we are considering here.) In addition, the challenged statement was made in the general section of the article discussing Boutique's ups and downs in the Essential Air Services program, rather than in sections of the article describing safety issues. In short, the challenged language contains "too many generalizations, elastic terms, and elements of subjectivity" to

28

support "proof or disproof" of the allegedly libelous inference Boutique suggests.  (*Nygard, supra*, 159 Cal.App.4th at p. 1050.)

We now turn to the two arguably more meaty allegations made by Boutique in its complaint.  The article stated, " 'Cancellations and delays were widespread in the company's route structure, and between 2018 and 2022 Boutique experienced more than 150 gate returns, air returns, diversions, aborted takeoffs, FAA-designated incidents, and events.  In the same period, there were 30 in-flight emergency declarations for reasons ranging from faulty landing gear indications to electrical failures to loss of engine power.' "  Boutique alleges this recitation falsely suggested its record for such incidents was excessive when compared with industry norms for commuter airlines.  Simpson's declaration provided some anecdotal evidence this was not the case.  Mondor responded in her declaration that "[t]here is no 'industry norm' for any of these incidents or events."

The article did not expressly draw or state any conclusions with respect to the enumerated safety and performance incidents set forth in the section of the article titled "Events, Incidents, Accidents."  (Boldface omitted.)  Rather, that section included the following statement: "These records, which were obtained via [the Freedom of Information Act] but are incomplete with several month-long gaps, contained a litany of issues ranging from flat tires, inoperative radios, continuous stick shaker warnings to failed cowling hinges, and numerous central advisory and warning system (CAWS) alerts."  This section also included, throughout, other references to the sources of the reported incidents.  Mondor additionally stated in her declaration that she "obtained all of [her] source material for the Article from publicly-available sources, including as a result of Freedom of Information Act ('FOIA') requests."

29

We agree the challenged statements could arguably be understood as implying that, in Mondor's opinion, Boutique had an outsized problem with safety and performance—a fact capable of being proved true or false. Nevertheless, Boutique has not established a probability of prevailing on this claim because even when a "statement arguably could be understood as implying facts capable of being proved true or false, it is not actionable if it discloses all of the statements of fact on which the opinion is based and those statements are true." (*Nygard, supra*, 159 Cal.App.4th at p. 1053 [statement that an employer did not want to let his employees see a doctor when injured not actionable when based on his own reported experience even when other declarations stated the statement was not universally true].)

Lastly, we turn to Boutique's claim that the article either states or implies that the company was subject to an ongoing FAA investigation with respect to safety issues.

To begin with, the article does not state, contrary to what Boutique claims, that the company "continued to be investigated by the FAA for safety violations." What the article actually says is: "It should be noted that the FAA's ongoing investigation into Boutique addresses not only the [Pilot Development Program] but also company training in general. *This could include issues beyond the program itself*, and records show that the FAA has received reports from [Air Traffic Control] over the past couple of years of several runway incursions and deviations from assigned altitude for Boutique pilots." (Italics added.)

Putting aside for the moment whether this language could be considered provably true or false, the statements regarding an "ongoing investigation" into Boutique are substantially true. As we have recited, Mondor received a denial of a Freedom of Information Act request in May

30

2022 stating the requested documents would not be provided "[d]ue to an ongoing agency investigation on training and the Pilot Development Program at Boutique." Moreover, Simpson admitted the FAA told "Boutique after the [Pilot Development Program] approval [in March] that it would be reviewing individual pilot flying hours for accreditation to see if those hours were logged on flights using autopilot." Thus, Boutique concedes there was an ongoing investigation into pilot training, at least involving Second In Command pilot training hours and how they were logged.

The question, then, is whether the statement that the FAA investigation included "company training in general" can support a defamation claim. We conclude it cannot. According to Mondor, she wrote the article "shortly after receiving [the Freedom of Information Act] response from the FAA. [She] concluded from this response that there was an ongoing FAA investigation of Boutique Air which transcended the Pilot Development Program to at least include other general training." Thus, it was Mondor's *opinion,* based on the FAA response, that the investigation may have extended to general training beyond the Pilot Development Program. And she made that clear in the article, writing: "[T]he FAA's ongoing investigation into Boutique addresses not only the [Second in Command Pilot Development Program] but also company training in general. *This could include issues beyond the program itself. . . .*" (Italics added.)

This is language of possibility, not language of provable fact. In other words, the training issues *could* be limited to those associated with the Pilot Development Program (i.e., Seconds in Command logging of training hours) or *could* go beyond that program. We therefore conclude that the statement, read in context and in its entirety, is nonactionable opinion that does not imply a false assertion of an objective fact. (See *McGarry*, *supra*,

31

154 Cal.App.4th at p. 112.) Any reasonable reader would understand that Mondor *did not know* whether the investigation went beyond the training issues associated with the lack of an approved Pilot Development Program.

It is true the sub headline states the FAA "probe has expanded into" areas other than training and the pilot development program. But a defendant need not " ' "justify every word of the allegedly defamatory matter" ' "; rather the inquiry concentrates upon substantial truth. " 'Put another way, the statement is not considered false unless it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." ' " (*Dickinson v. Cosby* (2017) 17 Cal.App.5th 655, 691; accord, *Vogel v. Felice* (2005) 127 Cal.App.4th 1006, 1021.) When the article is read as a whole—and given the plainly equivocal language Mondor used with respect to the scope of the investigation—we conclude the overall effect on a reader would be no different than if the sub-headline had stated "may have" instead of "has." (*J-M Manufacturing Co., Inc. v. Phillips & Cohen LLP* (2016) 247 Cal.App.4th 87, 102 [" 'when the alleged defamatory statement is contained in a headline, the headline must be read in conjunction with the entire article' "; plaintiff's reading of headline was "not reasonably supportable" when considered with the press release as a whole].)[8]

---

[8] At oral argument, counsel for Boutique argued that, if the language used by Mondor was "equivocal" as we have stated, its meaning is ambiguous. Thus, a jury is required to determine whether it is provably false. Counsel misapprehends our analysis. Mondor's statement was equivocal in that it suggested two equally possible scenarios—either the ongoing investigation into training went beyond the Pilot Development Program or it did not. Far from being demonstrably false, this statement is syllogistically true: Either one option is accurate, or the other must be.

In sum, as did the trial court, we too conclude Boutique cannot establish a probability of succeeding on the merits of its claims and it has therefore failed to carry its second-prong burden to defeat the defendants' special motions to strike.

## DISPOSITION

The judgments are affirmed. Defendants are entitled to their costs on appeal.

_____
Banke, Acting P. J.

We concur:


_____
Langhorne Wilson, J.


_____
Smiley, J.

A172025/A172026, *Boutique Air, Inc. v. Mondor*